# United States Court of Appeals for the Federal Circuit

---

**HOMER J. HOLLAND AND STEVEN BANGERT (CO-EXECUTOR OF THE ESTATE OF HOWARD R. ROSS),**
*Plaintiff-Appellees,*

AND

**FIRST BANK,**
*Plaintiff-Cross Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2009-5095, -5097

---

Appeal from the United States Court of Federal Claims in 95-CV-524, Judge George W. Miller.

---

Decided: October 12, 2010

---

DAVID B. BERGMAN, Arnold & Porter LLP, of Washington, DC, argued for plaintiffs-appellees and plaintiff-cross appellant. With him on the brief were HOWARD N. CAYNE, MICHAEL A. JOHNSON, JOSHUA P. WILSON and BENJAMIN H. WALLFISCH.

JOHN H. ROBERSON, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were MICHAEL F. HERTZ, Deputy Assistant Attorney General, JEANNE E. DAVIDSON, Director, and KENNETH M. DINTZER, Assistant Director.

———————————

Before RADER, *Chief Judge*, LOURIE and PROST, *Circuit Judges*.

PROST, *Circuit Judge*.

In this *Winstar* case, the United States ("the Government") appeals the United States Court of Federal Claims' grant of summary judgment holding the Government liable to Plaintiffs Homer J. Holland ("Holland"); Steven Bangert, as co-executor of the estate of Howard R. Ross ("Ross"); and First Bank (collectively, "Plaintiffs") for breach of contract, as well as the court's award of $18.6 million in damages to Plaintiff First Bank. First Bank cross-appeals the denial of its request for lost profit damages.

We reverse the Court of Federal Claims' holding that the Government is liable for breach of contract because we conclude that a settlement agreement between the parties extinguished all of Plaintiffs' claims against the Government arising out of the contracts at issue. In light of our conclusion on liability, we do not reach the damages issues raised in the Government's appeal and First Bank's cross-appeal.

BACKGROUND

A

In response to the savings and loan crisis of the early 1980s, the Federal Home Loan Bank Board ("Bank Board"), the Government agency that regulated all federally insured thrifts, and the Federal Savings and Loan Insurance Corporation ("FSLIC"), an agency under the Bank Board's authority that insured thrift deposits, sought healthy thrifts to take over ailing thrifts. To encourage such transactions, the Bank Board and FSLIC commonly offered the acquiring thrifts favorable regulatory treatment, including supervisory goodwill[1] and capital credits.[2] This case arises out of two such Government-assisted acquisitions of failing thrifts.

The first transaction ("River Valley I Acquisition") involved the acquisition of three insolvent Illinois thrifts: (1) Galva Federal Savings and Loan Association of Galva, Illinois ("Galva"), (2) Mutual Savings and Loan Associa-

---

[1]    Supervisory goodwill is the excess of the purchase price over the fair market value of the acquired thrift's identifiable assets. The Bank Board and FSLIC often permitted an acquiring thrift to count supervisory goodwill towards the thrift's regulatory capital requirements and to amortize the goodwill over long periods of time. *United States v. Winstar Corp.*, 518 U.S. 839, 848-51 (1996); *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1325 (Fed. Cir. 2005).

[2]    The capital credit incentive involved FSLIC making a cash contribution to the acquiring thrift and permitting the acquiring thrift to count the FSLIC contribution as credit to its regulatory capital. *Winstar*, 518 U.S. at 853; *S. Cal.*, 422 F.3d at 1325.

tion of Canton, Illinois ("Mutual"), and (3) Home Federal Savings and Loan Association of Peoria, Illinois ("Home"). The transaction provided for the merger of Galva and Mutual with and into Home, the conversion of Home into River Valley Savings Bank, F.S.B. ("River Valley I"), and Holland and Ross's acquisition of all the voting stock of River Valley I. An Assistance Agreement ("River Valley I Assistance Agreement") detailed the terms of the acquisition, specifying that FSLIC would provide River Valley I with an initial cash contribution of approximately $34.2 million, purchase 50,000 preferred shares of River Valley I for $5 million, and indemnify certain losses, and that River Valley I would provide a subordinated debenture of $4.6 million. The agreement further permitted River Valley I to count $8 million of FSLIC's initial cash contribution and $4.6 million of the subordinated debenture as regulatory capital.

On July 28, 1988, the Bank Board, as operating head of FSLIC, issued Resolution 88-638, in which the Bank Board approved the River Valley I Assistance Agreement and authorized FSLIC to execute the agreement. The "Accounting" section of Resolution 88-638 provided that River Valley I must report "to the Bank Board and the FSLIC" in accordance with generally accepted accounting principles ("GAAP") with two exceptions: (1) River Valley I may credit $8 million of FSLIC's initial cash contribution and $4.6 million of the subordinated debenture to its regulatory capital account "in accordance with the forbearance letter authorized pursuant to this Resolution" and (2) River Valley I may amortize "[t]he value of any unidentifiable intangible assets resulting from the application of push-down accounting . . . over a period not in excess of twenty-five (25) years by the straight line method." The Resolution further authorized and directed

an executive of the Bank Board to send River Valley I a letter regarding regulatory forbearances.

On the same day, the Bank Board sent a letter to Holland, as President and Chief Executive Officer of River Valley I ("River Valley I Forbearance Letter"). The River Valley I Forbearance Letter "granted" River Valley I several regulatory forbearances, including that River Valley I may: (1) credit a portion of FSLIC's initial cash contribution "not to exceed $8.0 million" to its regulatory capital and (2) amortize "the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchases . . . over a period not to exceed 25 years by the straight line method."

On July 29, 1988, River Valley I, Holland, Ross, and FSLIC executed the River Valley I Assistance Agreement. The Bank Board did not sign the River Valley I Assistance Agreement. The agreement, however, contained an integration clause, Section 23, which provided that:

> [t]his Agreement . . . constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only . . . any resolutions or letters concerning the Transaction or this Agreement issued by the Bank Board or the [FSLIC] in connection with the approval of the Transaction and this Agreement.

The second transaction ("River Valley II Acquisition") involved the merger of Republic Savings and Loan Association of South Beloit, Illinois ("Republic") with and into River Valley Savings Bank of Rock Falls, Illinois ("River Valley II"). Holland and Ross were the sole shareholders of River Valley II. An Assistance Agreement specified the

terms of the acquisition ("River Valley II Assistance Agreement") (collectively, with the River Valley I Assistance Agreement, "the Assistance Agreements"), including that FSLIC would indemnify River Valley II for certain losses and make a $16.6 million initial cash contribution to River Valley II, and that River Valley II could credit $5 million of this initial cash contribution as regulatory capital.

On July 27, 1988, the Bank Board issued Resolution 88-612, which, as with Resolution 88-638 for the River Valley I Acquisition, approved the River Valley II Assistance Agreement, authorized FSLIC to execute the agreement, and authorized and directed an executive of the Bank Board to send River Valley II a forbearance letter. The "Accounting" section of Resolution 88-612 provided that River Valley II must use GAAP "except that $5[ million] of the initial cash contribution by the FSLIC to River Valley [II] . . . shall be credited to the regulatory capital account of River Valley [II] and shall constitute regulatory capital."

On July 29, 1988, the Bank Board sent a letter to Holland as Vice Chairman of River Valley II ("River Valley II Forbearance Letter"). The River Valley II Forbearance Letter "granted" River Valley II approval "to issue and include in its regulatory capital . . . a subordinated debenture in the aggregate principal amount not to exceed $2[ million]" provided that certain conditions were satisfied.

On July 29, 1988, River Valley II and FSLIC executed the River Valley II Assistance Agreement. The Bank Board did not sign the agreement. The River Valley II Assistance Agreement included an integration clause identical to that in the River Valley I Assistance Agreement.

On May 18, 1989, the Bank Board sent a letter to Holland as Vice Chairman of River Valley II ("River Valley II Forbearance Confirmation Letter") to "confirm[] the understanding that the Bank Board and the FSLIC will waive or forbear from taking action to enforce certain requirements to River Valley [II]," including that River Valley II: (1) may credit to its regulatory capital a portion of FSLIC's initial cash contribution "not to exceed $5.0 million" and (2) may amortize "the value of any intangible asset, resulting from the application of push-down accounting in accounting for the purchase . . . over a period not to exceed 25 years by the straight line method."

B

On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, to prevent the collapse of the thrift industry. *Winstar*, 518 U.S. at 856. FIRREA abolished FSLIC and created a new thrift deposit insurance fund, the FSLIC Resolution Fund ("FRF"), under the Federal Deposit Insurance Corporation ("FDIC"). *Id.*; *Admiral Fin. Corp. v. United States*, 329 F.3d 1372, 1374 (Fed. Cir. 2003). With FIRREA's passage, the assets of FSLIC were placed in the FRF. *Admiral*, 329 F.3d at 1374.

FIRREA also replaced the Bank Board with the Office of Thrift Supervision ("OTS"), an office of the Treasury Department with the responsibility of regulating all federally insured savings associations. *Winstar*, 518 U.S. at 856. FIRREA obligated the OTS to "prescribe and maintain uniformly applicable capital standards for savings associations" in accordance with new stricter capital requirements. *Id.* at 856-57. The OTS issued regulations implementing FIRREA's capital standards

and directed that all savings associations should eliminate capital and accounting forbearances in determining their compliance with the new capital requirements. *Id.* at 857.

As such, FIRREA prohibited River Valley I and River Valley II from crediting FSLIC's initial cash contribution and the subordinated debt toward their regulatory capital requirements pursuant to the terms of the Assistance Agreements.

C

On March 31, 1991, River Valley I acquired River Valley II (the resulting entity is referred to as "River Valley III"). A few months later, on August 14, 1991, River Valley III, Holland, Ross, and the FDIC "in its capacity as manager of the . . . FRF" executed a Settlement Agreement ("Settlement Agreement"), which terminated the Assistance Agreements. The Settlement Agreement provided that River Valley III would pay the FDIC as manager of the FRF $50,000 as "full satisfaction" of River Valley III's obligation to share tax benefits under the Assistance Agreements, which "shall fully discharge River Valley [III] from any obligation or liability in connection therewith." In exchange, the FDIC would pay River Valley III nearly $3.3 million, which

> shall constitute full satisfaction of any and all remaining payments or contributions due or to become due under the Assistance Agreements, and shall fully discharge the [FDIC in its capacity as manager of the FRF] and the FRF from any obligation or liability in connection therewith.

The Settlement Agreement included an "Accord and Satisfaction" clause, Section 5 of the agreement, which provided:

> [P]erformance by each party of its respective obligations under this Settlement Agreement shall effect a complete accord and satisfaction of any and all obligations and liabilities of such party under the Assistance Agreements and, thenceforth, such party shall be fully discharged from any obligation or liability of any kind in connection therewith, including, without limitation, any and all actions, causes of action, suits, debts, sums of money, bonds, covenants, agreements, promises, damages, judgments, claims, and demands whatsoever, known or unknown, suspected or unsuspected, at law or in equity.

The "Third Party Beneficiaries" clause, Section 8(k) of the Settlement Agreement, provided that "[e]xcept as expressly provided in this Settlement Agreement, no provision of this Settlement Agreement is intended to benefit any persons other than the parties hereto."

On January 4, 1995, First Bank acquired River Valley III. First Bank is thus the successor-in-interest of River Valley I, River Valley II, and River Valley III.

D

On August 8, 1995, Plaintiffs Holland and Ross filed this action against the Government for breach of contract, asserting that the Government's enforcement of FIRREA violated its contractual obligations under the Assistance Agreements. *Holland v. United States* ("*Counterclaim Opinion*"), 86 Fed. Cl. 681, 687 (2009). The Court of

Federal Claims granted partial summary judgment in favor of Plaintiffs Holland and Ross as to the Government's liability for breach of the Assistance Agreements. *Holland v. United States*, 57 Fed. Cl. 540, 570 (2003).

Plaintiff First Bank was later joined as a plaintiff in the Third Amended Complaint. *Id.* The Court of Federal Claims then granted summary judgment in favor of First Bank on the issue of liability for breach of express contract as to both Assistance Agreements, and denied the Government's cross-motion for summary judgment on liability as to its affirmative defense of accord and satisfaction based on the Settlement Agreement. *Holland v. United States* ("*Liability Opinion*"), 74 Fed. Cl. 225 (2006).

The case proceeded to a bench trial on damages, after which the Court of Federal Claims awarded First Bank $18.6 million in damages for breach of contract. *Holland v. United States* ("*Damages Opinion*"), 83 Fed. Cl. 507, 509-10 (2008). Upon motion by Plaintiffs, the Court of Federal Claims then dismissed the Government's counterclaim asserting breach of a covenant not to sue and granted summary judgment in favor of Plaintiffs on the Government's counterclaim asserting entitlement to a setoff. *Counterclaim Opinion*, 86 Fed. Cl. at 684-85.

The Government timely appealed the Court of Federal Claims' liability and damages determinations to this Court. First Bank timely filed a cross-appeal challenging the denial of its request for lost profit damages. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

This case, one of the last of the *Winstar* cases, presents an unusual factual situation: Plaintiffs[3] entered into the Assistance Agreements with a sole Government agency, FSLIC, and then executed a broad Settlement Agreement with the successor to this Government agency, the FDIC as manager of the FRF. Nevertheless, Plaintiffs proceeded to maintain causes of action against the Government for breach of the Assistance Agreements and the Court of Federal Claims found the Government liable for breach of these agreements on summary judgment.

There is no dispute that FSLIC entered into the Assistance Agreements and that Plaintiffs executed the Settlement Agreement with FSLIC's successor, the FDIC as manager of the FRF. The issues for us, therefore, are whether the Bank Board, in light of the Bank Board resolutions and forbearance letters that were incorporated into the Assistance Agreements, had any contractual obligations under the Assistance Agreements, as well as the effect of the Settlement Agreement on any such obligations and liabilities of the Bank Board's successor, the OTS. We agree with the Court of Federal Claims that the Bank Board had contractual obligations to Plaintiffs

---

[3]    Plaintiff First Bank did not execute the Assistance Agreements and the Settlement Agreement. However, River Valley I acquired River Valley II and the resulting entity, River Valley III, was later acquired by First Bank. Under the "Successors and Assigns" clause of the Assistance Agreements and the Settlement Agreement, the agreements are binding on and inure to the benefit of First Bank as the successor to River Valley I, River Valley II, and River Valley III. Therefore, for convenience, we refer to "Plaintiffs'" execution of the Assistance Agreements and the Settlement Agreement.

stemming from promises made in its resolutions and forbearance letters, which were integrated into and became part of the Assistance Agreements. Yet we reverse the Court of Federal Claims' holding that the Government is liable for breach of the Assistance Agreements because we conclude that, in light of the Settlement Agreement, Plaintiffs' claims are barred on two alternative grounds. First, the Settlement Agreement, which released all causes of action against the FDIC as manager of the FRF, effected a release of any causes of action against its co-obligor, the OTS, in connection with the Assistance Agreements. Alternatively, we conclude that the Settlement Agreement constituted a complete accord and satisfaction of the obligations and liabilities of the FDIC as manager of the FRF, thereby discharging any causes of action against the OTS arising out of the Assistance Agreements.

"We review a grant of summary judgment by the Court of Federal Claims *de novo* . . . ." *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1346 (Fed. Cir. 2001). "Whether a contract exists is a mixed question of law and fact." *Id.* We review the Court of Federal Claims' legal conclusions de novo and review its findings of fact for clear error. *Id.* "Contract interpretation," however, "is a question of law, which we review *de novo*." *Id.*

We first address the Bank Board's contractual obligations pursuant to the resolutions and forbearance letters it issued in connection with the River Valley I Acquisition and the River Valley II Acquisition. We have repeatedly held that "mere approval of [a] merger" by the Bank Board does not amount to a contract because such approval is regulatory, not contractual, in nature. *Anderson v. United States*, 344 F.3d 1343, 1357 (Fed. Cir. 2003); *D*

*& N Bank v. United States*, 331 F.3d 1374, 1378-79 (Fed. Cir. 2003). We have, however, recognized that Bank Board resolutions and forbearance letters form contractual obligations where the Bank Board goes "beyond a mere statement of regulatory approval" and evidences "manifest assent" to accept and be bound by the terms of the thrift's offer. *Anderson*, 344 F.3d at 1355-57; *see First Commerce Corp. v. United States*, 335 F.3d 1373, 1378 (Fed. Cir. 2003). Indeed, even in the absence of an assistance agreement, we have held that Bank Board resolutions and letters were sufficient to establish the Bank Board's "contractual agreement" regarding "favorable accounting treatment." *Fifth Third Bank of W. Ohio v. United States*, 402 F.3d 1221, 1231-32 (Fed. Cir. 2005); *see Cal. Fed. Bank*, 245 F.3d at 1347.

Here, the Bank Board's resolutions and forbearance letters are not merely regulatory approvals of the relevant acquisitions. Instead, portions of these documents evidence the Bank Board's manifest assent to provide the favorable accounting treatment sought by River Valley I and River Valley II in exchange for their acquisition of failing thrifts. *See Fifth Third Bank*, 402 F.3d at 1231; *First Commerce Corp.*, 335 F.3d at 1381-82. With respect to the River Valley I Acquisition, the Bank Board issued Resolution 88-638 in which the Bank Board not only approved the River Valley I Assistance Agreement but also agreed, in the "Accounting" section of the resolution, that River Valley I must "*report to the Bank Board* and the FSLIC[]" in accordance with [GAAP]" with two exceptions: (1) River Valley I may credit $8 million of FSLIC's initial cash contribution and $4.6 million of the subordinated debenture to its "regulatory capital account . . . in accordance with the forbearance letter authorized pursuant to this Resolution" and (2) River Valley I may amortize "[t]he value of any unidentifiable intangible assets

resulting from the application of push-down accounting . . . over a period not in excess of twenty-five (25) years by the straight line method." (emphasis added). In the River Valley I Forbearance Letter, the Bank Board similarly "granted" River Valley I certain regulatory forbearances, including that: (1) River Valley may credit a portion of FSLIC's initial cash contribution "not to exceed $8.0 million" to its regulatory capital and (2) "[f]or purposes of *reporting to the Bank Board*, the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchases, may be amortized by River Valley [I] over a period not to exceed 25 years by the straight line method." (emphasis added). In other cases with resolutions and forbearance letters that included language regarding amortization identical to that featured in Resolution 88-638 and the River Valley I Forbearance Letter, we have recognized that "[t]he Bank Board made a manifest contractual promise . . . agreeing to permit extended amortization of goodwill." *Anderson*, 344 F.3d at 1356-58 (citing *Winstar*, 64 F.3d at 1544, *aff'd*, 518 U.S. 839 (1996); *First Commerce Corp.*, 335 F.3d at 1378). In addition to promises of extended amortization, these portions of the resolution and the forbearance letter reflect the Bank Board's express contractual promises to permit River Valley I, in reporting to the Bank Board, to depart from GAAP in accounting for its regulatory capital, including allowing an $8 million capital forbearance and a $4.6 million subordinated debt forbearance. *See S. Cal.*, 422 F.3d at 1326 ("The Forbearance Letter included the [Bank Board]'s promise that [the acquiring thrift] could depart from GAAP in accounting for its capital credits . . . ."); *see also Winstar*, 518 U.S. at 890. As such, through Resolution 88-638 and the River Valley I Forbearance Letter, the Bank Board created contractual obligations to provide River Valley I with favorable accounting treatment, including capital credits,

a subordinated debt forbearance, and amortization of goodwill.

As to the River Valley II Acquisition, the Bank Board made manifest contractual promises to River Valley II regarding preferential accounting treatment with similar contractual language in Resolution 88-612 and the River Valley II Forbearance Letter. Thus, the resolutions and forbearance letters that the Bank Board issued in connection with the River Valley I Acquisition and the River Valley II Acquisition manifested the Bank Board's acceptance of and intent to be bound by the favorable accounting treatment enumerated in these documents, including capital forbearances, subordinated debt forbearances, and amortization of goodwill.

These Bank Board resolutions and forbearance letters, containing the Bank Board's contractual promises regarding favorable accounting treatment, were expressly incorporated into the Assistance Agreements. Specifically, each Assistance Agreement included an integration clause, section 23, which provided:

> This Agreement . . . constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only . . . any resolutions or letters concerning the Transaction or this Agreement issued by the Bank Board or the [FSLIC] in connection with the approval of the Transaction and this Agreement.

In other *Winstar* cases, we have recognized that language identical to that in the integration clause of the Assistance Agreements explicitly incorporated the Bank Board's resolutions and forbearance letters, making the

resolutions and letters "part of the Assistance Agreement," *S. Cal.*, 422 F.3d at 1329, which is a "single binding contract," *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1304 (Fed. Cir. 2004); *see Franklin Fed. Savs. Bank v. United States*, 431 F.3d 1360, 1366 n.4 (Fed. Cir. 2005); *Cal. Fed. Bank*, 245 F.3d at 1345; *Winstar*, 64 F.3d at 1541-42. Similarly, the Supreme Court, in the *Winstar* plurality opinion, concluded that the "broad integration clauses" of the assistance agreements at issue, which in all relevant aspects are nearly identical to that featured in the Assistance Agreements in this case, "incorporate[d] the[] terms" of "the Bank Board resolutions [and f]orbearance [l]etters" into the assistance agreements. *Winstar*, 518 U.S. at 909-10; *see id.* at 862-67. As such, in light of the integration clauses of the Assistance Agreements, the terms of the relevant Bank Board resolutions and forbearance letters were integrated into and became part of each Assistance Agreement, forming a single, unified agreement.

Having concluded that the Bank Board made contractual promises to Plaintiffs in its resolutions and forbearance letters and that the terms of these resolutions and letters were incorporated into the Assistance Agreements, we must address the effect of integrating these documents into the Assistance Agreements, which were executed by FSLIC but not the Bank Board. We agree with the Court of Federal Claims that this incorporation did not eliminate the Bank Board's contractual promises to River Valley I and River Valley II, as the Government argues it did. *Counterclaim Opinion*, 86 Fed. Cl. at 690-91; *Liability Opinion*, 74 Fed. Cl. at 252-55; Appellant's Br. 16, 26-29. Instead, the Court of Federal Claims properly concluded that the incorporation of the Bank Board's contractual obligations from its resolutions and forbearance letters into the Assistance Agreements rendered the Bank

Board and FSLIC joint promisors or co-obligors with
respect to the promised favorable accounting treatment,
including the capital forbearances, subordinated debt
forbearances, and amortization periods. *Counterclaim
Opinion*, 86 Fed. Cl. at 690-91; *Liability Opinion*, 74 Fed.
Cl. at 252-55; *see Winstar*, 518 U.S. at 868 (concluding
that, in light of assistance agreements and the Bank
Board resolutions and letters, "'the *Bank Board and the
FSLIC* were contractually bound to recognize the supervi-
sory goodwill and the amortization periods reflected' in
the agreements between the parties") (emphasis added);
*id.* at 890 ("[*T*]*he Bank Board and FSLIC* had ample
statutory authority to . . . promise to permit respondents
to count supervisory goodwill and capital credits toward
regulatory capital and to pay respondents' damage if that
performance became impossible.") (emphasis added).
Under FIRREA, the obligations of the Bank Board passed
to the OTS as the Bank Board's successor and the liabili-
ties of FSLIC passed to the FRF under the management
of the FDIC. *See Winstar*, 518 U.S. at 856; *Admiral*, 329
F.3d at 1374; *Counterclaim Opinion*, 86 Fed. Cl. at 690-
91; *Liability Opinion*, 74 Fed. Cl. at 252-55. As such,
after FIRREA, the OTS and the FDIC as manager of the
FRF were co-obligors as to the promised favorable ac-
counting treatment in the Assistance Agreements.

In light of the above analysis, the critical issue, on
which this case turns, is how Plaintiffs' Settlement
Agreement with one co-obligor, the FDIC as manager of
the FRF, impacted Plaintiffs' claims against the other co-
obligor, the OTS. The Court of Federal Claims, on sum-
mary judgment, found the Government liable for breach
of the Assistance Agreements and rejected the Govern-
ment's accord and satisfaction defense, holding that the
Settlement Agreement showed that Plaintiffs only in-
tended to discharge claims against the FDIC as manager

of the FRF, not other Government agencies, such as the OTS. *Holland v. United States* ("*Reconsideration Opinion*"), 75 Fed. Cl. 492, 496-98 (2007); *Liability Opinion*, 74 Fed. Cl. at 247-55.

We must first clarify that release and accord and satisfaction are separate contractual defenses. *See Koules v. Euro-Am. Arbitrage, Inc.*, 689 N.E.2d 411, 414 (Ill. App. Ct. 1998); *Holman v. Simborg*, 504 N.E.2d 967, 969 (Ill. App. Ct. 1987). The parties on appeal, as well as the Court of Federal Claims, interchanged the terms without reference to the distinctions between them. *Reconsideration Opinion*; *Liability Opinion*, 74 Fed. Cl. at 247-255; Appellant's Br. 17 ("[P]laintiffs' complete *accord and satisfaction* with the FDIC concerning any and all claims connected with the Assistance Agreements, effected a similar *release* of the OTS.") (emphases added), *id.* 30-31; Appellees' Br. 27-28 ("Because neither the OTS nor the United States as a whole was *released* from any claim under the [Settlement] Agreement, the Government's *accord and satisfaction* defense fails.") (emphases added). "A release is a contract whereby a party abandons a claim or relinquishes a right that could be asserted against another." *Koules*, 689 N.E.2d at 414; *see Hagene v. Derek Polling Constr.*, 902 N.E.2d 1269, 1272 (Ill. App. Ct. 2009). In an accord and satisfaction, however, a claim is discharged because some performance other than that which was claimed to be due is accepted as full satisfaction of the claim. *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed. Cir. 2002); *see Koules*, 689 N.E.2d at 414; *Holman*, 504 N.E.2d at 969.

Although release and accord and satisfaction are distinct defenses, an agreement may constitute both a release and an accord and satisfaction, either of which may bar future claims. *Koules*, 689 N.E.2d at 414, 417. We

conclude that the Settlement Agreement constituted a release and, alternatively, an accord and satisfaction of all claims arising out of the Assistance Agreements against the FDIC as manager of the FRF, thereby releasing and discharging its co-obligor, the OTS. Because Plaintiffs' causes of action for breach of the Assistance Agreement are barred on both grounds, we reverse the Court of Federal Claims' holding that the Government is liable for breach of the agreements. We address each in turn.

A

We first consider the Settlement Agreement to the extent it released Plaintiffs' claims. On appeal, Plaintiffs concede that the Settlement Agreement released the FDIC as manager of the FRF. Appellees' Br. 29. The issues to be addressed are thus whether the release covered all claims arising out of the Assistance Agreement and whether the release discharged not only the FDIC as manager of the FRF but also its co-obligor, the OTS, and the Government as a whole.

Plaintiffs argue that the text of the Settlement Agreement, which does not reference the Government's regulatory capital promises, and the evidence surrounding its negotiation show that Plaintiffs only released claims arising out of the executory provisions, i.e., the financial assistance or payment provisions, of the Assistance Agreements and did not release the regulatory capital breach claims at issue in this case. Appellees' Br. 22-23, 28, 36-38. Like the Court of Federal Claims, we conclude that under the plain and unambiguous language of the Settlement Agreement, Plaintiffs completely released all claims against the FDIC as manager of the FRF "whether they result from a breach of the executory

promises or a breach of the forbearance promises, so long as th[ey] are in connection with the Assistance Agreements." *Liability Opinion*, 74 Fed. Cl. at 242; *see id.* at 238-47.

It is true that the Settlement Agreement never expressly refers to the regulatory forbearances promised in the Assistance Agreements. Nevertheless, the express terms of the Settlement Agreement release the FDIC as Manager of the FRF from "*any* obligation or liability of *any kind* in connection" with the Assistance Agreements, "including *without limitation, any and all* actions, causes of action, [and] suits." (emphases added). If the provisions of a release are "clear and unambiguous, they must be given their plain and ordinary meaning." *Bell BCI Co. v. United States*, 570 F.3d 1337, 1341 (Fed. Cir. 2009). Here, the terms of the release in the Settlement Agreement clearly and unambiguously establish that Plaintiffs released *all* claims against the FDIC as manager of the FRF in connection with the Assistance Agreements, not merely claims arising out of the executory provisions of the Assistance Agreements.[4] *See id.* (concluding that the district court erred in holding that plaintiff did not release certain types of claims because the language of the release "plainly" and "unambiguously" "released the government from *any and all* liability"); *cf. Bluebonnet*

---

[4] Because the terms of the release in the Settlement Agreement are clear, we do not rely on extrinsic evidence regarding the extent of the release. We note, however, that there is record evidence suggesting that the Settlement Agreement was intended to release "all claims arising . . . under" the Assistance Agreements, including claims "which by their terms survive the termination of the [Assistance ]Agreements," such as the regulatory forbearance promises.

*Savs. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1354-
55 (Fed. Cir. 2001) ("The settlement agreement's mutual
release excepted 'all claims of [the plaintiffs] to the extent
they relate to alleged breaches of contract relating to
capital forbearances, dividend forbearances, and dividend
payments, or takings arising from the foregoing.'"). The
broad release language therefore encompasses claims
arising out of both the regulatory and executory provi-
sions of the Assistance Agreements.[5]

Further, like the Court of Federal Claims, we note
that the broad release language in the Settlement Agree-
ment distinguishes this case from our decisions in *Old
Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir.
2006) and *Winstar Corp. v. United States*, 64 F.3d 1531
(Fed. Cir. 1995), *aff'd*, 518 U.S. 839 (1996), as well as the
Court of Federal Claims' decision in *Statesman Savings
Holding Corp. v. United States*, 41 Fed. Cl. 1 (1998), on
which Plaintiffs rely for their argument that the Settle-
ment Agreement only covered claims arising out of the
executory provisions of the Assistance Agreements. *See*

---

[5]  We reiterate our conclusion that the integration
clause of the Assistance Agreements incorporated the
terms of the Bank Board's resolutions and forbearance
letters, including the promised regulatory forbearances,
into the Assistance Agreements. We further note that the
capital forbearances are specifically enumerated in the
text of the Assistance Agreements, and the subordinated
debt forbearance is included in the River Valley I Assis-
tance Agreement. Therefore, as the Court of Federal
Claims concluded, the contractual promises made in the
resolutions and forbearance letters are obligations under
the Assistance Agreements themselves and, at a mini-
mum, are obligations "in connection" with the Assistance
Agreements. *Liability Opinion*, 74 Fed. Cl. at 244-46.
The release thus extends to claims arising from the
contractual obligations in these documents.

*Liability Opinion*, 74 Fed. Cl. at 238-40; Appellees' Br. 38-42. In these cases, the assistance agreement at issue terminated as a result of the termination clause of the assistance agreement itself, which referenced only the executory provisions of the agreement, or a limited termination agreement that merely accelerated the termination clause of the assistance agreement. *See Old Stone*, 450 F.3d at 1369; *Winstar*, 64 F.3d at 1542; *Statesman*, 41 Fed. Cl. at 5-9. As we emphasized in *Old Stone*, "the termination agreement *did no more* than accelerate a termination provision that was not designed to eliminate the promises of regulatory forbearance." 450 F.3d at 1369 (emphasis added).

Here, in contrast, the Settlement Agreement did more than accelerate the termination of the Assistance Agreements: it expressly provided for the release of the FDIC as manager of the FRF from "any obligation or liability of any kind in connection with" the Assistance Agreements, "including, without limitation, any and all actions, causes of actions, [and] suits." This expansive language encompasses all causes of action arising out of any obligation, including executory and regulatory promises, under the Assistance Agreements.

In order to address how this complete release of the FDIC as manager of the FRF affected its co-obligor, the OTS, we must determine the law to be applied. The Settlement Agreement included a choice-of-law provision, Section 8(d), which specified that the agreement "shall be governed by and construed in accordance with the federal law of the United States of America and, in the absence of controlling federal law, in accordance with the laws of the State of Illinois." Plaintiffs cite to the standard articulated in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971), thereby implicitly repeating their

argument, made before the Court of Federal Claims, that there is controlling federal law on the issue. Appellees' Br. 34. Yet, as the Court of Federal Claims held, *Zenith Radio* and the authorities on which it relied did not involve the release of co-obligors on a contract. *Reconsideration Opinion*, 75 Fed. Cl. at 494-95; *see Zenith*, 401 U.S. at 344-47. Thus, like the Court of Federal Claims, we conclude that there is no "controlling federal law" on the effect of a release of one co-obligor on other co-obligors and will therefore apply Illinois law to the issue. *Reconsideration Opinion*, 75 Fed. Cl. at 494-95.

The Government argues that, under Illinois law, Plaintiffs' complete release of the FDIC as manager of the FRF in the Settlement Agreement released its co-obligor, the OTS, because Plaintiffs did not expressly reserve their rights against the OTS. Appellant's Br. 17, 20, 36-42. We agree and thus reverse the Court of Federal Claims' holding to the contrary. Under Illinois common law, the full release of one co-obligor released all "even if the release contained an express reservation of rights against the others." *Porter v. Ford Motor Co.*, 449 N.E.2d 827, 829 (Ill. 1983). "This rule was widely criticized and was modified so that if a release contained an express reservation of rights against others it would be interpreted as a covenant not to sue," which, in practical effect, would release only the co-obligor named in the release. *Id.* Specifically, in *Parmelee v. Lawrence*, 44 Ill. 405 (1867), the Supreme Court of Illinois "rejected the strict common law rule 'in favor of the more reasonable rule[] that where the release of one of several obligors shows upon its face[] and in connection with the surrounding circumstances, that it was the intention of the parties not to release the co-obligors,'" the agreement shall be construed as a cove-

nant not to sue, rather than a release.[6]  *Id.* at 830 (quoting *Parmelee*, 44 Ill. 405).  In other words, an "unconditional release of one co-obligor releases all unless a contrary intent appears from the face of the instrument." *Id.* at 829-30; *see Cherney*, 702 N.E.2d at 234-35.  The intent at issue is whether the parties intended the agreement to serve as an "absolute and unconditional" release of the co-obligor executing the agreement.  *Porter*, 449 N.E.2d at 830; *Cherney*, 702 N.E.2d at 237; *McCormick v. McCormick*, 536 N.E.2d 419, 432 (Ill. App. Ct. 1988).

The Court of Federal Claims, along with Plaintiffs on appeal, place weight on the fact that the FDIC as manager of the FRF was the only named Government party to the Settlement Agreement and the terms of the Settlement Agreement, including the "Accord and Satisfaction" clause, refer only to performance by and the release of the FDIC as manager of the FRF.  *Reconsideration Opinion*, 75 Fed. Cl. at 497-98; *Liability Opinion*, 74 Fed. Cl. at 248-49; Appellees' Br. 28-32.  This emphasis on the Settlement Agreement's exclusive reference to the FDIC as manager of the FRF, however, is misplaced.  Under Illinois law, the absolute and unconditional release of one co-obligor releases all other co-obligors *even if* the other co-obligors "were not a party to the release or specifically identified in the release."  *Cherney*, 702 N.E.2d at 234-35,

---

[6]   Plaintiffs cite to the Joint Tortfeasor Contribution Act, a recent Illinois statute, as evidence that Illinois has modernized its rules regarding release.  Appellees' Br. 35-36.  "The Act, however, does not direct itself to co-obligors, to persons liable in contract, or to wrongdoers liable on any theory other than tort." *Cherney v. Soldinger*, 702 N.E.2d 231, 236 (Ill. App. Ct. 1998).  Accordingly, "the Act has abolished the common law rule only as to certain tortfeasors," *id.*, and is irrelevant to this case involving co-obligors on contracts.

237; *see McCormick*, 536 N.E.2d at 432. As the Supreme Court of Illinois has explained, "[t]he *Parmelee* holding does not require . . . that a release be construed as a release of only those persons expressly named." *Porter*, 449 N.E.2d at 830. Rather, Illinois courts regularly hold that a release of one co-obligor or joint tortfeasor releases others that were not a party to or otherwise named in the release. *See Porter*, 449 N.E.2d at 828-31; *Cherney*, 702 N.E.2d at 234-38; *McCormick*, 536 N.E.2d at 431-32; *see also Williams Elec. Games, Inc. v. Barry*, No. 97 C 3743, 2001 WL 1104619, at *12-*15 (N.D. Ill. Sept. 18, 2001). Thus, that only the FDIC as manager of the FRF was a party to the Settlement Agreement and that the terms of the release were limited to the parties to the Settlement Agreement is not dispositive of whether the release effected a release of the OTS.

The Court of Federal Claims, like Plaintiffs on appeal, also stress the "Third Party Beneficiaries" clause, section 8(k) of the Settlement Agreement. *Reconsideration Opinion*, 75 Fed. Cl. at 498; Appellees' Br. 30-36. This clause states: "Except as expressly provided in this Settlement Agreement, no provision of this Settlement Agreement is intended to benefit any persons other than the parties hereto." Cases in which Illinois courts have found that an agreement must be construed as a covenant not to sue because the parties did not intend to release other co-obligors, however, have featured explicit language reserving the plaintiff's rights against the other co-obligors. *See Porter*, 449 N.E.2d at 830 ("Unlike the case before us, the instrument in *Parmelee* contained an express provision that it should in no way 'affect my rights or demand against said Parmelee, Gage or Johnson.'"); *Pate v. City of Sesser*, 393 N.E.2d 1146, 1151 (Ill. App. Ct. 1979) ("I/we reserve the right to make claim against any and every other person . . . ."); *Mitchell v. Weiger*, 371 N.E.2d 888,

890-92 (Ill. App. Ct. 1977) ("[N]othing herein shall be deemed in any way to be a release by [plaintiff] of [specific enumerated joint tortfeasors] from any right or claim which [plaintiff] has or may have against them or any of them."); *Hulke v. Int'l Mfg. Co.*, 142 N.E.2d 717, 727-31 (Ill. App. Ct. 1957). In contrast, the general "Third Party Beneficiaries" clause in the Settlement Agreement is not sufficient to show that the parties intended the release to be less than an absolute release of the FDIC as manager of the FRF and thus, under Illinois law, fails to establish that the agreement should be construed as merely a covenant not to sue the FDIC as manager of the FRF.[7]

To the extent that the "surrounding circumstances" are relevant under Illinois law, they do not suggest an alternative result. *See Porter*, 449 N.E.2d at 830 (quoting

---

[7] In arguing that the Settlement Agreement expressly reserved their rights against other parties, Plaintiffs rely on *Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005). Appellees' Br. 30-34. *Centex*, however, is distinguishable. *Centex* did not involve Illinois law and the release provided that it "shall not operate in any way to limit the ability of [the plaintiffs] to bring any claim against the United States or any agency or instrumentality thereof (other than the FDIC Manager)." *Centex*, 395 F.3d at 1312. We rejected the Government's argument that the plaintiffs released the Government as a whole, because it ignored the language "expressly except[ing] suits against the United States" from the release. *Id.* at 1311-12. Given this explicit language of reservation, *Centex* does not help Plaintiffs establish such a reservation in this case. Indeed, we took no position as to what "the effect of the waiver as to the FDIC manager might have been in the absence of th[e] proviso [excluding suits against the United States]." *Id.* In our view, *Centex* only highlights Plaintiffs' failure to reserve their rights against the United States and the OTS in the Settlement Agreement.

*Parmelee*, 44 Ill. 405).  The letters and documents prepared in the course of finalizing the Settlement Agreement do not show that Plaintiffs intended the release of claims against the FDIC as manager of the FRF to be conditional or less than absolute.  Instead, they include broad references to the resolution of the Assistance Agreements and never suggest that Plaintiffs sought to reserve their rights against the OTS.  Further, the OTS needed to express its lack of objection to the termination of the Assistance Agreements before the Settlement Agreement could be executed, a fact to which the preparatory documents repeatedly refer.  Thus, the OTS's role in the approval of the Settlement Agreement, at least to some extent, goes against a showing that Plaintiffs reserved their rights against the OTS.

As such, we conclude that Plaintiffs' complete and unconditional release of all claims against the FDIC as manager of the FRF effected a release of all such claims against its co-obligor, the OTS.  Because Plaintiffs released all claims against the only two Government agencies with obligations under the Assistance Agreements, the United States is not liable for breach of the Assistance Agreements.

B

In the alternative, we conclude that Plaintiffs' accord and satisfaction with the FDIC as manager of the FRF, in which Plaintiffs accepted nearly $3.3 million as a "complete accord and satisfaction of any and all obligations and liabilities of [the FDIC as manager of the FRF] under the Assistance Agreements," discharged the OTS, as co-obligor of the FDIC as manager of the FRF, and bars Plaintiffs' causes of action for breach of the Assistance Agreements.

Our precedent establishes that the affirmative defense of "accord and satisfaction requires four elements: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration." *O'Connor*, 308 F.3d at 1240; *see O'Conner v. United States*, 60 Fed. Cl. 164, 168 (2004). The parties have never contested proper subject matter and do not dispute on appeal that this element is satisfied. *Liability Opinion*, 74 Fed. Cl. at 238. Moreover, the parties, on appeal, do not contest the Court of Federal Claims' conclusion that the FDIC as manager of the FRF, acting as an agency of the United States, was competent to effect an accord and satisfaction and that the $3.3 million payment by the FDIC as manager of the FRF constituted sufficient consideration for the accord and satisfaction of all claims arising out the Assistance Agreements. *Id.* at 238, 246-47. We agree with the Court of Federal Claims that these elements of accord and satisfaction are satisfied.

With respect to the "meeting of the minds" element, Plaintiffs argue on appeal that the text of the Settlement Agreement, as well as the evidence surrounding its negotiation, show that the parties intended the agreement to discharge the FDIC as manager of the FRF only as to its

executory promises, not its regulatory capital forbearance promises. Appellees' Br. 22, 36-44. Based on the plain language of the Settlement Agreement, we cannot agree. A meeting of the minds occurs where there are "accompanying expressions sufficient to make the [claimant] understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise." *Chesapeake & Potomac Tel. Co. of Va. v. United States*, 654 F.2d 711, 716 (Ct. Cl. 1981); *Tamerlane, Ltd. v. United States*, 81 Fed. Cl. 752, 764 (2008). The Settlement Agreement provides that the payment of nearly $3.3 million by the FDIC as manager of the FRF to Plaintiffs "shall effect a *complete accord and satisfaction* of *any and all obligations and liabilities of such party* under the Assistance Agreements."[8] (emphases added). This clear language of the Settlement Agreement is more than sufficient to make Plaintiffs understand that the payment constituted full and complete satisfaction of all obligations and liabilities, including the regulatory forbearances, of the FDIC as manager of the FRF under the Assistance Agreements. Indeed, any other understanding of the broad accord and satisfaction language of the Settlement Agreement would be unreasonable.

In light of the above analysis, all four elements of an accord and satisfaction are met and the Settlement Agreement thus constituted a complete accord and satisfaction with the FDIC as manager of the FRF. The re-

---

[8] As we noted in our analysis of the Settlement Agreement as a release, the broad language of the Settlement Agreement distinguishes this case from others in which courts have held that the termination of the assistance agreement at issue terminated only the executory provisions, not the regulatory forbearance provisions.

maining issue, therefore, is the effect of Plaintiffs' accord and satisfaction with the FDIC as manager of the FRF on its co-obligor, the OTS.

Neither party has pointed to any "controlling federal law" on the effect of an accord and satisfaction with one co-obligor on other co-obligors. Thus, pursuant to the choice-of-law provision of the Settlement Agreement, we will analyze the issue under Illinois law.

The Government asserts that under Illinois law, Plaintiffs' complete accord and satisfaction of any claims arising out of the Assistance Agreements with the FDIC as manager of the FRF prevents Plaintiffs from pursuing their claims against the Government because Plaintiffs are only entitled to one complete satisfaction of their claims. Appellant's Br. 17, 20, 30-32. We agree. Illinois law recognizes the "principle that there can be but a single satisfaction for an injury or wrong." *Holman*, 504 N.E.2d at 970; *see Packers Trading Co. v. Pederson*, No. 84 C 10452, 1985 WL 19452, at *2 (N.D. Ill. June 25, 1985). As a result, an accord and satisfaction "generally extinguishes or discharges the cause of action" and is "considered a bar to further action." *McCullough v. Orcutt*, 145 N.E.2d 109, 116 (Ill. App. Ct. 1957); *Hulke*, 142 N.E.2d at 727. Thus, a plaintiff's accord and satisfaction, wherein payment is accepted as full satisfaction, with one joint wrongdoer, such as a co-obligor, operates to discharge the others in full and bars the plaintiff's actions against the others. *See City of Chicago v. Babcock*, 32 N.E. 271, 273 (1892); *Holman*, 504 N.E.2d at 970; *McCullough*, 145 N.E.2d at 116; *Hulke*, 142 N.E.2d at 727; *Wagner v. Union Stock Yards & Transit Co.*, 41 Ill. App. 408 (Ill. App. Ct. 1891); *see also Packers*, 1985 WL 19452, at *2; *Porter*, 449 N.E.2d at 830; *Pate*, 393 N.E.2d at 1150; *Good Prods. Co. v. Dwyer*, 203 Ill. App. 217 (Ill. App. Ct.

1917); Restatement (Second) of Contracts §§ 278, 281, 293 (1981).  As such, Plaintiffs' acceptance of the nearly $3.3 million payment from the FDIC as manager of the FRF as a "complete" satisfaction of its obligations and liabilities under the Assistance Agreements similarly discharged its co-obligor, the OTS, and bars any claims against the OTS for breach of the Assistance Agreements.  Plaintiffs are not entitled to more than one full satisfaction for breach of the promises made to them in the Assistance Agreements.

Given that the accord and satisfaction discharged both the FDIC as manager of the FRF and the OTS, the only Government agencies with obligations under the Assistance Agreements, the United States is not liable to Plaintiffs for breach of the Assistance Agreements.

## C

In sum, we reverse the Court of Federal Claims' holding that the Government is liable for breach of the Assistance Agreements.  We conclude that Plaintiffs' release of all claims against the FDIC as manager of the FRF in the Settlement Agreement effected a release of all claims against its co-obligor, the OTS.  Alternatively, Plaintiffs' accord and satisfaction with the FDIC as manager of the FRF in the Settlement Agreement discharged the OTS. Accordingly, because Plaintiffs relinquished their claims against the only two Government agencies with obligations under the Assistance Agreements, the United States is not liable to Plaintiffs for breach of the agreements.

**REVERSED**