ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| KUNJ Construction Corporation | ) | ASBCA No. 63240 |
| | ) | |
| Under Contract No. N40085-16-D-0302 | ) | |

APPEARANCES FOR THE APPELLANT:    Matthew T. Schoonover, Esq.
John M. Mattox II, Esq.
Timothy J. Laughlin, Esq.
  Schoonover & Moriarty LLC
  Olathe, KS

APPEARANCES FOR THE GOVERNMENT:    Craig D. Jensen, Esq.
  Navy Chief Trial Attorney
Merideth Mendenhall, Esq.
  Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE MCLISH ON
THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

This appeal involves a contract to replace a central base fire system at the Philadelphia Naval Business Center in Philadelphia, Pennsylvania. The Navy moves for summary judgment on the grounds that the undisputed facts establish that the claims asserted by appellant KUNJ Construction Corporation (KUNJ) are barred by the Navy's affirmative defenses of accord and satisfaction and release, and also that the claims lack merit. KUNJ cross-moves for summary judgment in its favor on the government's affirmative defenses and contests the Navy's position that it is entitled to summary judgment on the merits of the claims.

We deny the motions.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

In accordance with Board Rule 7(c)(1), the government included with its motion a Statement of Undisputed Material Facts (NSUMF), with which KUNJ raises no material dispute (app. resp. at 2). KUNJ's opposition and cross-motion provided a Statement of Further Undisputed Material Facts (KFUMF) (*id.* at 2-6). The government objects to many of these as legal conclusions or irrelevant but does not dispute their factual content (Navy resp. to KFUMF at 3-10). Below, we summarize the facts that neither party disputes for purposes of these motions.

**The Contract and Task Order**

1. On or about December 7, 2015, the Navy and KUNJ entered into Contract No. N40085-16-D-0302, a firm-fixed price, multiple-award construction contract for "New Construction, Renovation, Alteration and Repair Projects primarily in the state of Pennsylvania" (Contract) (NSUMF ¶ 1; R4, tab 1 at GOV000001-77).

2. On or about August 2, 2016, the Navy awarded KUNJ Task Order 0004 (Task Order 4), a firm fixed-price task order under the Contract, to "Replace the Central Base Fire System @ [Philadelphia Naval Business Center] PNBC Phila. PA," in the total amount of $2,449,000 (NSUMF ¶ 5; compl. at ¶ 6; R4, tab 6 at GOV000089-105).

3. Task Order 4 required KUNJ to "install a new base radio fire monitoring system and install a fire alarm system in buildings 20 & 1029" (NSUMF ¶ 6; R4, tab 6 at GOV000091).

4. The original contract completion date for Task Order 4 was August 1, 2018 (NSUMF ¶ 7; KFUMF ¶ 63; R4, tab 6 at GOV000098).

**Modification No. P0001**

5. KUNJ and the Navy entered into bilateral Modification No. P0001 (Modification No. 1) to Task Order 4 with an effective date of August 20, 2018. Modification No. 1 was a no-cost modification that extended the completion date to June 14, 2019, and changed various technical aspects of Task Order 4, including installation of transmitters, dialers, master boxes, strobe lights, roving photovoltaic transmitters, and removal of existing transmitters, disconnect switches, and notification devices (NSUMF ¶ 20; KFUMF ¶ 50; R4, tab 7 at GOV000393-94). Several of the technical changes included work in Buildings 20 and 1029 (NSUMF ¶ 20; R4, tab 7 at GOV000393).

6. Modification No. 1 was executed by both parties as of August 22, 2018 (NSUMF ¶¶ 21-22; gov't reply at 2;[1] R4, tab 7 at GOV000392).

---

[1] The Navy's Reply in Support of its Motion for Summary Judgment and Response in Opposition to KUNJ's Cross-Motion is unpaginated. We refer to the page numbers shown in the pdf file containing the document.

7.  Modification No. 1 included the following language:

> Acceptance of this modification by the Contractor
> constitutes an accord and satisfaction and represents
> payment in full for both time and money and for any and
> all costs, impact effect, and for delays and disruptions
> arising out of, or incidental to, the work as herein revised.

(NSUMF ¶ 23; R4, tab 7 at GOV000393)

**Modification No. P0002**

8.  KUNJ and the Navy entered into bilateral Modification No. P0002 (Modification No. 2) to Task Order 4 with an effective date of June 14, 2019.  This modification extended the completion date by 399 days to July 17, 2020, increased the total cost of Task Order 4 by $69,144.00 to $2,518,144.00, and incorporated a change to the shift work schedule regarding work in Building 20.  (NSUMF ¶ 24; R4, tab 8 at GOV000395-97; compl. ¶ 11)

9.  Modification No. 2 was executed by both parties as of March 27, 2020 (NSUMF ¶¶ 25-26; R4, tab 8 at GOV000395).

10.  Modification No. 2 included the following language:

> Acceptance of this modification by the contractor
> constitutes an accord and satisfaction and represents
> payment in full for both time and money for any and all
> costs, impact effect, and for delays and disruptions arising
> out of, or incidental to, the work as herein revised.

(NSUMF ¶ 27; R4, tab 8 at GOV000396)

**Modification No. P0003**

11.  KUNJ and the Navy entered into bilateral Modification No. P0003 (Modification No. 3) to Task Order 4 with an effective date of July 17, 2020.  This modification extended the completion date by 392 days to August 13, 2021, increased the total cost of Task Order 4 by $465,114.00 to $2,983,258.00, and incorporated PC 03 HVAC DETECTORS for all necessary labor and materials to integrate the HVAC system with the Fire Alarm system as required by codes.  The PC 03 HVAC detectors work included work in Buildings 20 and 1029.  (NSUMF ¶ 28; R4, tab 9 at GOV000398-400; compl. ¶ 12)

12. Modification No. 3 was executed by both parties as of May 6, 2021 (NSUMF ¶¶ 29-30; R4, tab 9 at GOV000398).

13. Modification No. 3 included the following language:

> Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised.

(NSUMF ¶ 31; R4, tab 9 at GOV000399)

**Request for Equitable Adjustment and Claim**

14. KUNJ submitted a Request for Equitable Adjustment (REA) dated January 7, 2021, seeking $1,395,093.00 for "delays and interruptions sustained during the contract duration . . . ." (NSUMF ¶ 32; R4, tab 10 at GOV000401-38). The Contracting Officer denied the REA by letter dated April 20, 2021 (NSUMF ¶ 38; KFUMF ¶ 62; R4, tab 11 at GOV000439-41).

15. KUNJ then submitted a claim to the contracting officer dated September 28, 2021 (KUNJ Claim), seeking "$1,204,902.10 in compensation for increased costs generated by Navy-caused delays" (NSUMF ¶ 39; R4, tab 12 at GOV000442).

16. The KUNJ Claim contended that the Navy delayed KUNJ's work in six ways. First, the Navy allegedly failed to grant KUNJ a facility clearance and instead implemented an escort and "sanitization" system under which the Navy provided attendants to accompany the contractor's workers in secure buildings and used coverings to conceal sensitive machinery and other elements from view. KUNJ's claim contended that it was delayed when, on many occasions, the Navy did not supply sufficient escorts, or the escorts were late or failed to appear. KUNJ further alleged that it was delayed when it was precluded from working because of the Navy's "sanitization" efforts. (R4, tab 12 at GOV000443-44)

17. Second, the claim alleged that the Navy was responsible for delays caused by other building access issues and other Navy activities that prevented KUNJ from completing its work as scheduled (R4, tab 12 at GOV000445).

18. Third, KUNJ's claim contended that the Navy delayed providing necessary authorization to the manufacturer of radio frequency transmitters to sell the units to KUNJ's subcontractor (R4, tab 12 at GOV000445).

4

19. Fourth, the claim alleged that the Navy delayed approving the use of a "PED camera," causing KUNJ the loss of significant time (R4, tab 12 at GOV000446).

20. Fifth, the claim alleged that the Navy caused delay by directing the relocation of conduit the KUNJ had installed in a Navy-approved location (R4, tab 12 at GOV000446).

21. Sixth, KUNJ's claim alleged that the Navy delayed progress by not allowing KUNJ to access Building 20. Eventually, in October 2018, the Navy agreed in principle that KUNJ could work in Building 20 after hours, but then delayed implementing the new arrangement because of funding issues. (R4, tab 12 at GOV000446)

22. The claim sought $759,712.50 for "Supervisory Employees (employed by KUNJ Construction and its subcontractor);" $156,991.12 for "Additional Subcontractor Labor;" and $288,198.48 for "Other Costs" (R4, tab 12 at GOV000447-49, 000571).[2]

**Contracting Officer's Final Decision**

23. The Contracting Officer issued a final decision on KUNJ's claim on March 25, 2022. The final decision determined that KUNJ was due $5,265.09 for increased costs generated by alleged Navy-caused delays and $26,699 for additional work for portable roving units. The contracting officer denied KUNJ's access delay claims because "the contract documents specifically put the contractor on notice that there may be delays in accessing the site." (R4, tab 13a at GOV000603) The contracting officer denied the remainder of KUNJ's delay claims because "supervisory personnel were required for the full duration of the contract, regardless of what specific work was being performed" and because the Navy and KUNJ had executed three bilateral modifications containing language "indicating full accord and satisfaction" (*Id.*; NSUMF ¶ 44)

**Appeal and Complaint**

24. KUNJ appealed to the Board.

25. In its Complaint, KUNJ alleges the same six delay claims that it asserted in its Claim to the contracting officer and seeks a total of $1,202,834.87 (compl. ¶¶ 20-51,

---

[2] The claim also sought a contract modification and $26,699 to perform additional work on certain portable roving units specified by the Contract. The government advises that "[t]his amount for portable roving units is not disputed in this appeal" (gov't mot. at 15 n.3).

88). This total is broken down into three components. First, KUNJ alleges that, between April 11, 2018 and November 5, 2020, it lost 1,699.5 productive hours waiting for Navy escorts to arrive (*id.* ¶¶ 67-68). KUNJ seeks $156,991.12 for these alleged delay costs (*id.* ¶ 71).

26. Second, KUNJ alleges that Navy-caused delays to the contract completion date to August 2021 required it to maintain its Project Manager for an additional 1,250 hours, maintain its Quality Control/Site Safety Health Officer on the Contract for an additional 5,000 hours, and maintain a working superintendent at the project site for 115 days longer than anticipated between August 1, 2018 and December 31, 2020 (compl. ¶¶ 76-79). KUNJ states it was "required to maintain its supervisory personnel – i.e., its Project Manager, Quality Control/Site Safety Health Officer, and working superintendent – on the Contract during the Contract's entire performance period" (*id.* ¶ 80). KUNJ alleges it incurred "$562,750 in additional salary costs for its Project Manager, Quality Control/Site Safety Health Officer, and working superintendent" and "is entitled to $196,962.50 (35% of $562,750), which accounts for the insurance, taxes, and fringe benefits attributable to these personnel" for a total of $759,712.50 (*id.* ¶¶ 85-86).

27. Third, KUNJ seeks additional costs totaling $286,131.25, consisting of field office overhead of $75,971.25; subcontractor overhead of $7,849.56; home office overhead of $103,472.36; profit of $77,279.78; and bond premium costs of $21,558.30 (compl. ¶¶ 87-87e).

**Contract Clauses and Provisions Relevant to Claim**

28. The Contract incorporates by reference Federal Acquisition Regulation (FAR) 52.236-6, SUPERINTENDENCE BY THE CONTRACTOR (APR 1984), which requires the contractor to always have a competent superintendent on the worksite (NSUMF ¶ 2; R4, tab 1 at GOV000056).

29. The project specifications for Task Order 4 require the contractor to provide a Safety and Health Officer (SSHO) and requires that the SSHO be at the work site at all times, unless specified differently in the contract (NSUMF ¶ 17; R4, tab 6c at GOV000226).

30. The project specifications also require that the contractor establish and maintain a quality control program, including a Quality Control Manager, whose presence at the site is required before any construction work or testing could be performed (NSUMF ¶ 18; R4, tab 6c at GOV000248).

6

31. The Contract and Task Order 4 incorporate by full text Naval Facilities Acquisition Standards (NFAS) Clause 5252.236-9301, SPECIAL WORKING CONDITIONS AND ENTRY TO WORK AREA (OCT 2004), providing:

> The Government under certain circumstances may require denial of entry to the work areas under this contract where the Contractor's work or presence would constitute a safety or security hazard to ordance[3] [sic] storage or handling operations. Restrictions covering entry to and availability of the work areas are as follows:
>
> (a) Entry. Entry to work areas located within the special Security Limited areas, defined as those work areas located within the existing security fence, can be granted subject to special personnel requirements as specified herein and to other normal security and safety requirements. Complete denial of entry to the Limited Area may be required during brief periods of one to two hours (normally) and on rare occasions of two to four hours. For bidding purposes, the Contractor shall assume denial of entry to the work areas in the Limited Area of six 2-hour denials and one 4-hour denial per month.
>
> (b) Vehicle Delay. The Contractor shall also assume for bidding purposes that, in addition to site denial, each vehicle and/or unit of construction equipment will be delayed during each movement through the security gate, both entering and leaving the limited area. Delays will average _____ [2hrs][4]_____ .
>
> (b) [sic] Operational Considerations. To reduce delay time while preserving required security, the following points should be considered in operational planning:
>
> (1) Vehicle Search. Security regulations required that all vehicles, when authorized to enter the Limited Area be thoroughly searched by guard force personnel. Such a search will be required for all vehicle/ construction

---

[3] The government does not contend that there was ordnance in any of the buildings where KUNJ was working (KFUMF ¶ 60; Navy's Response to KFUMF at 8).

[4] In the Contract, this space in the clause is blank. In Task Order 4, it is filled in with "2hrs" (R4, tab 1 at GOV000071-72; tab 6 at GOV000102-03).

equipment.  Accordingly, once a vehicle or unit of construction equipment has been cleared, it may be left in the Limited Area after initial entry has been made.  For the period of time authorized the vehicle/equipment left in the Limited Area will be assigned parking areas by the Contracting Officer.  The vehicle/equipment must be secured as specified in paragraph entitled "SECURITY REQUIREMENTS."  The intent is to reduce the Contractor loss of time at the security gate.  No private vehicles will be allowed to enter the Limited Area.

(2)  Delivery Vehicles.  Guard force personnel will inspect vehicles delivering construction materials while the driver is being processed for entry into the Limited Area.  A Security Escort will then escort the driver and vehicle in the Limited Area.  To provide this service, delivery schedules should be promulgated in advance and vendors made aware that a reasonable delay can be expected if delivery is other than the time specified.   Deliveries after 1600 hours will not be allowed entry into the Limited Area without prior approval of the Physical Security Officer.

(NSUMF ¶¶ 4, 9; R4, tab 1 at GOV00071-72; tab 6 at GOV000102-03)

32.  The NFAS February 2016 edition prescribed the use of clause 5252.236-9301, SPECIAL WORKING CONDITIONS AND ENTRY TO WORK AREA (OCT 2004) "in solicitations/contracts for construction work to be performed in and around secured areas or ammunition depots and magazines" (NSUMF ¶ 10; gov't mot., ex. 1 at 84).

33.  The Statement of Work and project specifications for Task Order 4 both provided that "Contractor personnel will need a security clearance to work in Building 20, 1029, 546 and 592" (NSUMF ¶¶ 12, 14; R4, tab 6 at GOV000093; tab 6c at GOV000183).

34.  Task Order 4 included a response to a request for information stating that the expected lead time to acquire the security clearance required for personnel working in Buildings #20, #546, #592, & #1029 was 18 months (NSUMF ¶ 8; R4, tab 6 at GOV000094-95).

8

35.  Section 01 14 00, WORK RESTRICTIONS, 1.2 CONTRACTOR ACCESS AND USE OF PREMISES, the project specifications provide:

1.2.1 Activity Regulations

Ensure that Contractor personnel employed on the Activity become familiar with and obey Activity regulations.  Keep within the limits of the work and avenues of ingress and egress.  Wear hard hats in designated areas.  Do not enter any restricted areas unless required to do so and until cleared for such entry.  The Contractor's equipment shall be conspicuously marked for identification.
. . . .

1.2.1.3 Personnel Entry Approval

Failure to obtain entry approval will not affect the contract price or time of completion.

(NSUMF ¶ 15; R4, tab 6c at GOV000186)

36.  Attachment E project Spec at Section 01 14 00, WORK RESTRICTIONS,

1.3 SECURITY REQUIREMENTS provides:

Contract Clause "FAR 52.204-2, Security Requirements and Alternate II," and the following apply:

1.  The Government will monitor work being preformed [sic] in the Navy Yard - Propeller Division, buildings 20, 546, 592 and 1029.

2.  No work will be permitted within the Navy Yard – Propeller Division buildings while personnel not meeting the required security requirements are on site.

3.  No employee or representative of the Contractor will be admitted to the site of the work until the following items are submitted and approved:

a.  A company letter, on letterhead stationary [sic], listing the Contractor's and each subcontractor's employees including the employee's social security number, address and security clearness [sic].

9

b.  A completed Personnel Security Questionnaire (DD form 2221) for every individual requiring access to the work site.

c.  No employee or representative of the Contractor will be admitted to the Navy Yard- Propeller Division building unless he/she has a security clearance.  Identification issued to personnel employed by a Contractor is to facilitate admittance to and exit from Navy Yard - Propeller Division buildings.  It shall be the Contractor's responsibility to collect and account for all identification passes issued to his personnel at the expiration of the contract or when no longer required.  The Contractor shall comply with all security regulation currently in force at the Navy Yard - Propeller Division buildings.  Each of the Contractor's employees will be issued an approved pass which he shall have with him during work hours and shall wear in a conspicuous location on his/her outer clothing.  The Contractor shall obtain all necessary security clearances before entering any of the Navy Yard - Propeller Division buildings.

4.  Private vehicles belonging to a contractor/subcontractor employee will not be granted access to the Navy Yard - Propeller Division building areas.

5.  Failure to obtain entry approval will not affect the contract price or time of completion.

6.  No photographs will be taken in or around the Navy Yard -Propeller Division buildings.

(NSUMF ¶ 16; R4, tab 6c at GOV000187-88)

37.  The project specifications require the contractor to provide a report for each day that work is performed.  Among the information required on the reports was "directions received, problems encountered during construction, work progress and delays, conflicts or errors in the drawings or specifications, field changes, safety hazards encountered, instructions given and corrective actions taken, delays encountered and a record of visitors to the work site, quality control problem areas, deviations from the QC Plan, construction deficiencies encountered, meetings held." (NSUMF ¶ 19; R4, tab 6c at GOV000257-58)

10

## I.      Summary Judgment Standard

We look to Rule 56 of the Federal Rules of Civil Procedure for guidance in deciding summary judgment motions. Board Rule 7(c)(2); *Fluor Intercontinental, Inc.*, ASBCA Nos. 62550, 62672, 22-1 BCA ¶ 38,105 at 185,099. Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002). The applicable substantive law identifies which facts are material and might affect the outcome of the appeal. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its initial burden, the opposing party "'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* 477 U.S. at 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). Our task at this stage is not "to weigh the evidence and determine the truth of the matter, but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial." *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393 (quoting *Liberty Lobby*, 477 U.S. at 249). A dispute is genuine only if, on the entirety of the record, a reasonable factfinder could resolve a factual matter in favor of the nonmovant. *Liberty Lobby*, 477 U.S. at 248. The evidence must be viewed in the light most favorable to the party opposing the motion. *Crown Operations,* 289 F.3d at 1375.

We are not required to rule for one side or the other merely because both parties have moved for summary judgment, each asserting that there are no material issues of fact. *Northrop Grumman Corporation,* ASBCA No. 62165, 23-1 BCA ¶ 38,394 at 186,557. Rather, "[e]ach cross-motion is evaluated separately on its merits, and all reasonable inferences are drawn in favor of the defending party; the Board is not bound to 'grant judgment as a matter of law for one side or the other.'" *Osborne Constr. Co.,* ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,513 (quoting *Mingus Constructors*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

**II.     The Cross-Motions for Summary Judgment on the Defenses of Accord and Satisfaction and Release**

The government first seeks summary judgment upon its affirmative defenses of accord and satisfaction and release.  It contends that KUNJ's claims are barred by the three bilateral modification clauses stating that "[a]cceptance of this modification by the Contractor constitutes an accord and satisfaction and represents payment in full for both time and money [and][5] for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised" (NSUMF ¶¶ 23, 27, 31).[6]  KUNJ cross-moves for summary judgment in its favor on the government's defenses, contending that the undisputed facts demonstrate that the release language does not bar its claims.

Release and accord and satisfaction are separate affirmative defenses.  *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010).  A document such as a bilateral contractual modification, however, may be both a release and an accord and satisfaction.  *Id.*

An accord and satisfaction occurs when "some performance other than that which was claimed to be due is accepted as full satisfaction of the claim." *Holland*,

---

[5] Modification No. 1 includes this "and", while Modifications Nos. 2-3 do not.

[6] The government asserts in passing that this release language is "the standard contractor release that NAVFAC includes in all of its contract modifications," but cites no support for this (gov't mot. at 25).  As discussed below, the same or similar language has been the subject of numerous decisions by this Board and the Court of Federal Claims.

The provenance of the language and the reasons for its use instead of other potential clauses, such as the one set forth in Federal Acquisition Regulation 43.204(c)(2), are not evident from the present record.  FAR 43.204(c)(2) provides that, when entering into a supplemental agreement making an equitable adjustment as the result of a change order, the government's contracting officer should include a release similar to:

Contractor's Statement of Release

In consideration of the modification(s) agree to herein as complete equitable adjustments for the Contractor's _____ (describe) _____ 'proposal(s) for adjustment,' the Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts or circumstances giving rise to the 'proposal(s) for adjustment' (except for _____).

12

621 F.3d at 1377. The government bears the burden to prove the elements of the defense, which are "'(1) proper subject; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration.'" *Id.*at 1382*; Bell BCI*, 570 F.3d 1337, 1341 (Fed. Cir. 2009); *Pyrotechnic Specialties, Inc.*, ASBCA No. 57890 *et al.*, 17-1 BCA ¶ 36,696 at 178,703. "To reach an accord and satisfaction there must be mutual agreement between the parties with the intention clearly stated and known to the contractor." *Coastal Government Services, Inc.,* ASBCA No. 50283, 99-1 BCA ¶ 30,348 at 150,088.

A release is a contract whereby a party abandons a claim or relinquishes a right that could be asserted against another. *Holland*, 621 F.3d at 1377; *Pratt & Whitney*, 22-1 BCA ¶ 38,104 at 185,085. In interpreting a release, general principles of contract interpretation apply. *Optex Systems, Inc.*, ASBCA No. 58220, 14-1 BCA ¶ 35,801 at 175,097. Releases are liberally construed and "the circumstances surrounding the signing of the release" will be reviewed to "effect the true intent of the parties." *Sedona Contracting, Inc.*, ASBCA No. 52093, 99-2 BCA ¶30,466 at 150,513. "[T]he inquiry regarding releases should focus on the intent of the parties at the time the release is executed, and this intent should be sought from the whole and every part of the instrument . . . ." *Optex*, 14-1 BCA ¶ 35,801 at 175,097 (quoting *Futuronics Corp.*, ASBCA No. 29324, 85-2 BCA ¶ 18,137 at 91,045). "Even where a release is complete on its face and unqualified, as is the case here, we will review the circumstances surrounding its execution in order to effect the true intention of the parties." *Sedona Contracting, Inc.*, 99-2 BCA ¶ 30,466 at 150,513. "[A] cold reading of the document is not the end of the matter." *Hunt Bldg. Corp.*, ASBCA No. 50083, 97-1 BCA ¶ 28,807 at 143,700 (quoting *Able Prods. Co.*, ASBCA No. 24221, 80-2 BCA ¶ 14,733 at 72,692).

In order to sustain its burden under either defense, the government "must show that both parties intended [the bilateral modifications] to release and/or discharge the claim[s] that [are] the subject of this appeal." *Optex*, 14-1 BCA ¶ 35,801 at 175,097.

a. *The Parties' Contentions*

The parties disagree as to the scope of the release language. The government advances multiple interpretations. At times it argues that the language constitutes "general releases" that bar all claims on Task Order 4 that arose prior to the bilateral modifications in which they appear (gov't. reply at 5-7). It also advances the narrower argument that the release language bars KUNJ's claims because the claims concern the same time periods and subject matters that were addressed by the parties in Modifications Nos. 1-3 (gov't mot. at 19-21).

KUNJ argues that the phrase "work as herein revised" limits the scope of each clause such that it bars only claims arising from the particular subject matter addressed

13

by the modification. Because its current claims do not relate to the specific subject matters addressed by the modifications, KUNJ contends, they are not barred. (App. resp. at 7-18) In support, KUNJ relies on decisions in which the Board rejected accord and satisfaction defenses where the government did not show, either from the face of the bilateral modification or other evidence, that the parties intended the modification to bar the claims the contractor sought to assert. *See, e.g.*, *Collazo Contractors, Inc.*, ASBCA No. 53925, 05-2 BCA ¶ 33035 at 163,747 (rejecting accord and satisfaction defense based on release language because the government did not prove "there was a clearly stated intention and a meeting of the minds between the parties that 'the work as herein revised' included the delay claimed by appellant, or any part of it."); *Bay West, Inc.*, ASBCA No. 54166, 07-1 BCA ¶ 33,569 at 166,304 (rejecting accord and satisfaction defense where testimony from the parties indicated there was no mutual agreement that the bilateral modification provision would bar the contractor's claim.)

b. *The Release Language is Not a General Release of KUNJ's Claims*

We begin with the text of the release language to assess the government's argument that the clause operates as a general release of all pre-modification claims arising under the task order. By its plain terms, the language does not purport to be a general release. It does not contain the term "release" at all, instead employing the less straightforward and more legalistic term "accord and satisfaction." Further, it does not plainly state that it bars all claims arising out of Task Order 4 prior to the modification. Rather, the language refers to matters "arising out of, or incidental to, the work as herein revised."

The phrase "the work as herein revised" does not clearly and unambiguously embrace all pre-modification claims. This is evident from prior decisions addressing the same or similar language as used in this matter. For example, the government's general release theory cannot be squared with *Collazo Contractors, Inc.*, which involved a NAVFAC contract and a bilateral modification containing the aforementioned release language. In that case, as here, the modification containing the clause did not reference the specific claims at issue in the appeal. The Board held that, to prevail, the government must show a meeting of the minds between the parties that the phrase "the work as herein revised" in the release language included the unreferenced claims. *Collazo*, 05-2 BCA ¶ 33,035 at 163,747. Because the government did not adequately prove such a meeting of the minds, the claims were not barred by the release language. *Id.* If the language was a general release of all pre-modification claims, as the government contends here, no further proof as to the scope of the release would have been necessary in *Collazo*. Similarly, in *Conquistador Dorado Joint Venture*, ASBCA No. 60042 *et al.*, 20-1 BCA ¶ 37,628 at 182,679, we denied the government's motion for summary judgment where further record development was necessary to determine whether the claim at issue fell within the scope of a modification containing the release language.

14

The government points to *Coastal Envtl. Grp., Inc.*, ASBCA No. 60410, 18-1 BCA ¶ 37,102, which also addressed a provision essentially identical to the release language in this appeal (although, unlike here, the clause there was labeled a "Contractor's release"). *Id.* at 180,590. We held there that the phrase "work as herein revised" in the release referred to all of the contract work, and thus effectively was a general release that "wiped the slate clean" and barred all pre-modification causes of government-caused delay. *Id.* at 180,591. But that holding was based upon the particular terms of the modification in which the clause appeared. Specifically, the Board concluded that the modification as a whole made clear the parties' intent that "work" as stated in the release meant the same thing as the "work specified in the subject contract" referenced elsewhere in the modification. *Id.* The *Coastal* decision, therefore, does not support the proposition that the release language is a general release. Rather, that case involved an instance where examination of the modification as a whole was sufficient to establish the intent of the parties that the release would bar all pre-modification claims.

These and other decisions, together with the text of the clause, compel the conclusion that the release language is not a general release on the facts of this case. Instead, determining the scope of the claims barred by that clause requires a determination of the parties' intent through examination of the bilateral modification as a whole in the context of the claim at issue and, if necessary, extrinsic evidence.[7]

---

[7] *E.g., COSTAR III, LLC,* ASBCA No. 56479, 11-2 BCA ¶ 34,830 at 171,370 (Navy Release Clause in bilateral modifications adjusting pricing based on wage increases claims for further price adjustments for wage increases during the same period); *Whiting-Turner Contracting Co.*, ASBCA No. 56319, 10-1 BCA ¶ 34,436 at 169,951 (claims barred because they were "related to the work described" in bilateral modifications containing the release); *Fox Constr. Inc.*, ASBCA No. 55265 *et al.*, 08-1 BCA ¶ 33,810 at 167,380-81 (claims barred because they were based on the same changes to the work made by bilateral modifications containing the Navy Release Clause); *R.J. Lanthier Co.,* ASBCA No. 51636, 04-1 BCA ¶ 32,481 at 160,668 and n.2 (claims that were the subject of bilateral modifications addressing same subject matters were barred by Navy Release Clause; claim not specifically referenced in modification not barred). *See also LCC-MZT Team IV v. United States,* 155 Fed. Cl. 387, 456 (2021) (claim barred where bilateral modification containing provision similar to Navy Release Clause specifically referenced the subject matter of the claim); *Metric Constr. Co., v. United States*, 81 Fed. Cl. 804, 822-24 (2008) (the phrase "work as herein revised" in release was patently ambiguous where the modification provided a no-cost extension of time "due to batch plant fire, weather, etc."; extrinsic evidence showed that parties did not intend to bar claim at issue); *R.P. Richards Constr. Co. v. United States,* 51 Fed. Cl. 116, 122-23 (2001) (bilateral modification containing release language was ambiguous as to the scope of the

c. *The Undisputed Facts Do Not Demonstrate Whether the Parties Intended the Accord and Satisfaction Provisions to Bar KUNJ's Current Claims*

Alternatively, the government contends that it should prevail under the narrower reading of the release language because KUNJ's current claims are sufficiently related to the work changed by the modifications that they are covered by the clause (gov't mot. at 19-27). The government relies on the undisputed facts that (1) the modifications' extensions to the contract completion date cover the time period for which KUNJ now seeks compensation for Navy-caused delay; and (2) the modifications addressed work in the secure areas to which KUNJ now claims it was not given timely access (*id.* at 20-21). KUNJ disagrees, relying on the undisputed fact that the modifications do not specifically reference KUNJ's current delay claims and contending that its claims fall outside the specific subject matters of the three modifications and therefore are not barred by the release language (app. resp. at 7).

We conclude that the three modifications at issue here do not, on their face, demonstrate that the parties intended them to cover the subject matter of KUNJ's current delay claims, and are thus ambiguous as to that issue. *See Metric*, 81 Fed. Cl. at 822-24 (Release language ambiguous in circumstances presented); *R.P. Richards,* 51 Fed. Cl. at 122-23 (same). The modifications do not identify the reasons for the extensions to the completion date, and neither party attempts at this stage to demonstrate those reasons with extrinsic evidence. *Cf. Metric,* 81 Fed. Cl. at 823 (scope of Navy Release Clause unclear where no-cost extension was "markedly ambiguous in reciting the causes for the extension"). Those reasons could bear on whether or not the release language should be interpreted as resolving all claims for delay arising during the same time period.[8]

Similarly, the fact that the modifications addressed work in the secure areas does not establish that the parties intended the modifications to resolve all claims relating in any way to the secure areas. Modification No. 1 made changes to certain technical requirements, including for work in the secure areas. Modification No. 2

claims covered; extrinsic evidence considered in determining that the modification covered the same subject matter as contractor's claim).

[8] On at least one occasion, the release language apparently was modified to make explicit that it barred claims arising from not only "the work as herein revised," but also the time extension provided for in the modification. *See Safeco Credit v. United States,* 44 Fed. Cl. 406, 419 (1999) (clause stated: "Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full (for both time and money) for any and all costs, impact effect, and/or delays arising out of, or incidental to, the work as herein revised *and the extension of the contract completion time*") (emphasis added).

16

shifted the work schedule in Building 20. Modification No. 3 added PC 03 HVAC DETECTORS, including for the secure areas. It is unclear from the terms of the modifications alone whether there is sufficient overlap between the facts and circumstances giving rise to these modifications and those giving rise to the claims that the releases should be read to bar the claims. *Cf. Metric*, 81 Fed. Cl. at 823 ("work as herein revised" ambiguous "because the contract modification covered a substantial number of additions and deletions to the project as well as the no-cost time extension").

On summary judgment, we must make all reasonable inferences in favor of the nonmovant. The government has not demonstrated that it is entitled to summary judgment on its accord and satisfaction and release defenses because the reasons for the modifications' time extensions are unknown, the connections between the work in the secure areas addressed by the modifications and the claims are not clear, and the releases drafted and inserted by the Navy do not indisputably reveal the parties' intentions. The undisputed facts do not establish the requisite "proper subject matter" and "meeting of the minds" for the accord and satisfaction defense and the modifications are not so unambiguous that the government is entitled to summary judgment on its release defense. Nor can we grant KUNJ's cross-motion for summary judgment where the undisputed facts do not preclude the possibility that the parties intended to resolve all claims for delay during the extension periods provided by, or the changed work in the secure areas addressed by, the modifications.[9]

Consistent with our prior decisions addressing the same or similar clauses, we conclude that, in the circumstances presented here, determining the scope of the releases requires further development of the record to determine the parties' intent and whether there was a meeting of the minds as to what claims would be barred. *See, e.g., Collazo*, 05-2 BCA ¶ 33,035 at 163,747; *Conquistador Dorado*, 20-1 BCA ¶ 37,628 at 182,679 (denying summary judgment based on release language where further record development necessary to determine whether the claim falls within the scope of the modification containing the clause); *Speegle Constr., Inc.*, ASBCA No. 60089, 16-1 BCA ¶ 36,371 at 177,292 (denying summary judgment on release and accord and satisfaction defenses where there was doubt whether the scope of the release encompassed the contractor's claim); *Korte-Fusco Joint Venture*, ASBCA No. 59767, 15-1 BCA ¶ 36,158 at 176,455-56 (same).

---

[9] KUNJ makes the additional argument that its claim cannot be barred by the releases because its claim "was asserted prior to Modification Nos. 1-3, but the claim is not referenced in [the] releases" (app. resp. at 9-10). The undisputed facts indicate that, when KUNJ submitted its request for equitable adjustment on January 7, 2021, Modification Nos.1-2 had been executed, but Modification No. 3 had not. These facts are insufficient to establish that KUNJ is entitled to summary judgment on the government's defenses.

17

Because the undisputed facts do not demonstrate that either party is entitled to judgment in its favor as a matter of law, the cross-motions for summary judgment on this issue are denied.

## III.    The Government's Motion for Summary Judgment on the Merits

The government also seeks summary judgment in its favor on the ground that, even if KUNJ's claims are not barred by accord and satisfaction or release, the undisputed facts demonstrate that they fail on the merits.  The government contends that the terms of the Contract and Task Order 4 put KUNJ on notice of work restrictions and security requirements in secure areas that could lead to delays and instructed KUNJ to account for them in its bid.  Specifically, it relies upon NFAS 5152.236-9301, SPECIAL WORKING CONDITIONS AND ENTRY TO WORK AREA (OCT 2004) (which appears in both the Contract and Task Order 4), as well as provisions requiring contractor personnel to have security clearances to access the secure buildings, stating that the government will monitor the work in those areas, and instructing that "[f]ailure to obtain entry approval will not affect the contract price or time of completion" (*see* SOF ¶¶ 35, 36).  The government also relies upon the provision addressing daily reports, which it contends required KUNJ to document all delays in the remarks section.

The government has not demonstrated that KUNJ's claims are barred by the contractual provisions it relies upon.  To begin with, the government does not explain how those provisions could bar KUNJ's claims that do not appear to arise from security restrictions, such as its claims that the Navy delayed authorizing the manufacturer of certain radio frequency transmitters to KUNJ (compl. ¶¶ 34-38); delayed authorizing the use of a PED camera (*id.* ¶¶ 39-41); caused delay by mismanaging a requirement that KUNJ relocate conduit above the overhead crane (*id.* ¶¶ 42-46); and delayed facilitating KUNJ's access to Building 20 for reasons not having to do with security (*id.* ¶¶ 47-51).  The government's argument thus appears to extend only to KUNJ's claims that it was delayed by the Navy's failure to properly implement its escort and sanitization approach in the secure areas and by other "general access delays" (*id.* ¶¶ 20-33).

Those claims are not clearly barred by the contractual provisions the government cites.  The government contends that NFAS 5152.236-9301 informed KUNJ of special working conditions in and around the secure work areas, that access delays were to be expected, and to assume a certain amount of delay when preparing its bid (gov't mot. at 28).  KUNJ argues that NFAS 5152.236-9301 does not apply here because it is limited to situations involving "a safety or security hazard to ordnance storage or handling operations," and it is undisputed that none of the work areas at issue here included any ordnance.  The government's briefs do not set forth a contrary interpretation, other than to simply assert that NFAS 5152.236-9301 "applies

18

to construction work in and around secured areas" (*id.* at 29).  Although not stated, it appears the government relies upon NFAS 36.5100, which specifies that NFAS 5152.236-9301 is to be included in "solicitations/contracts for construction work to be performed in and around secured areas or ammunition depots and magazines" (*see* SOF ¶ 32).  That is insufficient to refute KUNJ's interpretation, which is based on the specific language of the provision.  Therefore, we consider NFAS 5152.236-9301 inapplicable for purposes of deciding these motions.

Even if NFAS 5152.236-9301 applied here, the government has not established that any of its terms bar KUNJ's claims.  Instead, the government contends that all of the contract language concerning safety and security should be read together and interpreted to mean that "KUNJ is not entitled to additional time or compensation for the failure to gain entry to the work area" (gov't reply at 8).  The only provisions the government cites that might be read as imposing such a prohibition are the two that state "[f]ailure to obtain entry approval will not affect the contract price or time of completion" (SOF ¶¶ 35, 36).  KUNJ argues that its claims are not based on failure to obtain "entry approval," but rather on the Navy's failures to meet its obligations to facilitate KUNJ's access to the secure work areas *after* it had already obtained "entry approval" (app. reply at 6-7).  The government has not attempted to demonstrate to the contrary.  Accordingly, the government has not met its burden to point to undisputed facts establishing that KUNJ's claims are precluded by the contract.

We also decline the government's request for a ruling that KUNJ's potential recovery is limited to those delays that it documented in the daily reports, which the government contends was contractually required.  The undisputed facts do not establish that KUNJ failed to document any of its alleged delays or, if it did, what the circumstances were and how or whether the government was prejudiced.  *See Goodloe Marine*, ASBCA No. 61960, 23-2 BCA ¶ 38,387 at 186,521 ("Lack of strict compliance with many kinds of contract requirements concerning writings and notifications have frequently been held to be of no consequence where the conduct of the parties have made it clear that formal adherence would serve no useful purpose or that the parties have in fact waived it.") (quoting *Copco Steel & Eng'g Co. v. United States,* 341 F.2d 590, 598 (Ct. Cl. 1965)).  Accordingly, the government has failed to carry its burden to demonstrate that it is entitled to summary judgment on this issue as a matter of law.

19

<u>CONCLUSION</u>

We have considered all of the parties' arguments and are not persuaded that either party is entitled to the summary judgment rulings they request. Accordingly, the motions are denied.

Dated: January 25, 2024

THOMAS P. MCLISH
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

MICHAEL N. O'CONNELL
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63240, Appeal of KUNJ Construction Corporation, rendered in conformance with the Board's Charter.

Dated: January 25, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals