ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| GSC Construction, Inc. | ) ASBCA No. 61380 |
| | ) |
| Under Contract No. W912HN-10-D-0049 | ) |

APPEARANCE FOR THE APPELLANT: Patrick B. Kernan, Esq.
    Asmar, Schor, McKenna, PLLC
    Washington, DC

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
    Engineer Chief Trial Attorney
    Allie E. Vandivier, Esq.
    Engineer Trial Attorney
    U.S. Army Engineer District, Savannah

OPINION BY ADMINISTRATIVE JUDGE JAMES R. SWEET

    This appeal involves a task order the Army Corps of Engineers (government) issued to appellant GSC Construction, Inc. (GSC) to design and renovate Army Ranger barracks at Fort Benning, Georgia. Following our decision on the government's motion for summary judgment and GSC's narrowing of the issues, two claims remain. Those claims are that: (1) GSC is entitled to an equitable adjustment for the costs it incurred leveling the floors; and (2) the government improperly required GSC to remedy the defects and the damage related to two floods under a warranty clause. *GSC Construction, Inc.*, ASBCA No. 61380, 20-1 BCA ¶ 37,626, at 182,666-69 (*GSC I*); (app. br. at 12).[1] The parties have elected to proceed under Board Rule 11. This decision addresses only entitlement.

---

[1] As laid out in *GSC I*, GSC appealed the contracting officer's denial of seven claims. Those related to alleged: (1) delay due to a failure to provide as-built drawings; (2) audio visual changes; (3) out-of-scope testing; (4) floor leveling changes; (5) fire alarm changes; (6) improperly requiring GSC to remedy the defects and the damage related to two floods; and (7) failure to pay an outstanding contract balance. *GSC*, 20-1 BCA ¶ 37,626 at 182,663-64. Moreover, claim (4) involved two sub-claims. Those were that the government required: (a) additional furring work to bring the floor slabs' edges into vertical alignment; and (b) the installation of Ardex floor leveling compound to make the floors acceptably level. In *GSC I*, we granted the government summary judgment on claims (1), (3), (4a), (5), and (7). *Id*. at 182,666-69. We denied the government's motion for summary judgment on claims (2), (4b), and (6). *Id*.

As discussed in greater detail below, the government has satisfied its burden of establishing the defense that GSC released the floor leveling claim. Moreover, the government has satisfied its burden of showing that the most probable cause of the first—but not the second—flood was GSC's defective materials or workmanship when considered in light of other possible causes. Therefore, the government properly required GSC to remedy the defect and the damage related to the first flood, but improperly required GSC to remedy the defect and the damage related to the second flood. As a result, the appeal is denied as to the claims regarding floor leveling and the first flood, but is sustained as to the claim regarding the second flood.

FINDINGS OF FACT

I.      Background

1. On September 7, 2010, the government awarded to GSC Contract No. W912HN-10-D-0049 (Contract), a multiple award task order contract for design/build, design-bid-build, or renovation type projects in the South Atlantic Division Area of Operation (R4, tab 3 at 30-32).

2. On August 18, 2011, the government issued a request for proposal for a task order on the Contract to design and renovate Buildings 2833 and 2834 at Fort Benning, Georgia (the Project) (R4, tab 4 at 218).

3. On September 25, 2012, the government awarded to GSC Task Order, 0007 (Task Order) on the Contract for the Project (R4, tab 6 at 1057, 1062).

II.     Progressive Collapse Resistance and Floor Leveling

4. The statement of work (Statement of Work) attached to the August 18, 2011 request for proposal indicated that most of the as-built drawings for Buildings 2833 and 2834 were available for GSC's review before GSC submitted its proposal (R4, tab 4 at 260). Moreover, the Statement of Work required compliance with UFC 4-023-03 Design of Buildings to Resist Progressive Collapse (Progressive Collapse Resistance Requirements) (*id*. at 294).[2]

---

Further, in its Rule 11 briefing, GSC abandoned claim (2) (app. br. at 12). Therefore, we only address claims (4b) and (6).

[2] "Progressive collapse" is "the spread of an initial local failure from element to element resulting, eventually, in the collapse of an entire structure or a disproportionately large part of it." Nat'l Institute of Standards and Tech., *Best Practices for Reducing the Potential for Progressive Collapse in Buildings* at 1 (quoting Am. Soc'y of Civ. Eng'rs Standard 7-05), *available at* https://www.govinfo.gov

5. On May 9, 2013, GSC's Vice President and Project Manager, Mr. John Phillips (R4, tab 17 at 1243-44; tab 42 at 5027), sent the government a letter indicating that GSC's pricing to meet the Progressive Collapse Resistance Requirements for Buildings 2833 and 2834 was too low. Because the government had failed to satisfy its obligation to provide as-built drawings before GSC submitted its proposal, GSC had to rely upon prior pricing from a vendor, which turned out to be too low for Buildings 2833 and 2834. (R4, tab 17 at 1243-44)

6. On May 29, 2013, Vice President Phillips sent a request for equitable adjustment for a price increase based upon the government's failure to provide information necessary to properly price the cost of meeting the Progressive Collapse Resistance Requirements (R4, tab 17 at 1257-58).

7. On July 29, 2013, Vice President Phillips sent the contracting officer (CO) a letter indicating that GSC had encountered a differing site condition because the existing floor slabs in Building 2833 were not level. The July 29, 2013 letter did not address Building 2834. (R4, tab 22 at 4307)

8. On September 26, 2013, the CO sent Request for Proposal 0004 (Request for Proposal) to GSC in response to GSC's May 29, 2013 request for equitable adjustment (R4, tab 24 at 4336).

9. In reply, GSC submitted a proposal regarding Progressive Collapse Resistance Requirements compliance (Progressive Collapse Resistance Proposal) on October 15, 2013 (R4, tab 24 at 4340). The Progressive Collapse Resistance Proposal totaled $499,931.60, and included $81,530.50, before markups, for leveling the floor slabs (*id.* at 4340). Attached to the Progressive Collapse Resistance Proposal was a quote from Mastercraft Flooring, Inc. (Mastercraft) for $81,530.50 to cover 30,388 square feet of floor in Buildings 2833 and 2834 with 1,304 bags of leveling compound (*id*. at 4355).

10. On March 5, 2014, GSC and the government held negotiations regarding the Progressive Collapse Resistance Proposal (R4, tab 24 at 4363). A May 13, 2014 price negotiation memorandum (Price Negotiation Memorandum), which is an internal government document, memorialized those negotiations, stating that:

> The contractor's argument concerns the floor leveling is that the increased amount of fiberwrap necessary to meet the [progressive collapse resistance] requirements has [led] to the materials causing the new flooring finishes to not be able to be installed properly. The fiberwrap is applied directly to the slab and it has some thickness to it so that all the differences in elevations on the slab where there is or is

3

not fiberwrap has caused issues with the new flooring and there needs to be floor leveling installed to balance out the floor surface. This floor leveling cost in the proposal is $81,530.50. . . .

. . . .

**Objective:** Based on the explanation provided above, it is the Government's belief that any floor leveling required is the responsibility of the design build contractor. . . . [The Government seeks a] cost decrease of $81,530.50. . . .

**Negotiated**: The contractor and the Government discussed this item in detail during negotiations. The Government requested the contractor to delete the floor leveling costs for the reasons outlined above. The contractor reviewed and agreed to remove these costs.

(*id*. at 4366-67) Based upon the removal of the floor leveling costs and other adjustments, the government and GSC agreed to a net payment of $412,337.34 to GSC for the May 29, 2013 request for equitable adjustment (*id*. at 4368).

11. On May 15, 2014, the parties executed Bilateral Modification No. 04 (R4, tab 24 at 4369). Bilateral Modification No.04 contained a release (Release), which stated that:

This modification . . . is issued based on the Government's receipt of GSC's Request for Equitable Adjustment (REA) negotiated for the amount of $412,337.34. On May [2]9, 2013,[3] the Contractor submitted a REA for compensation for add'l progressive collapse measures. The CO determined the REA has merit, in part, and the parties have

[3] The Release referred to a May 19, 2013 request for equitable adjustment. We conclude that that was a typographical error because there is no May 19, 2013 request for equitable adjustment in the record. Rather, we conclude that the Release meant to refer to GSC's May 29, 2013 request for equitable adjustment because the date of the May 29, 2013 request for equitable adjustment was one numeral off from the May 19, 2013, date in the Release (finding ¶ 6). Moreover, it was the May 29, 2013 request for equitable adjustment that sought compensation for additional progressive collapse measures that resulted in the settlement, which the Release attributed to a May 19, 2013 request for equitable adjustment (finding ¶ 6).

4

> reached a fair & reasonable adjustment in contract price for settlement in full of the REA including all direct & indirect costs associated with this change. . . . It is understood & agreed the contract price is increased in the lump sum amount as stated for full & complete settlement of the REA. . . . Payment of the amount indicated constitutes an accord & satisfaction of all outstanding claims by the Contractor.

(*Id*.) In neither the Release nor any other document in the record did GSC reserve its right to pursue any floor leveling claim independent and apart from the released claims in the Release (*id*.).

12. In a declaration and at his deposition, the government's Project Engineer, Mr. William Cale Simons, who represented the government at the negotiations and prepared the Price Negotiation Memorandum (R4, tab 24 at 4363; Simons decl. ¶¶ 11-12 (R4, tab 52 at 5822)), indicated that it was his understanding that the Release settled GSC's floor leveling claims based on the discussions with GSC he took part in, in which GSC agreed to remove the costs for floor levelling as contemporaneously documented in the Price Negotiations Memorandum. This understanding was confirmed by that fact that GSC did not request additional compensation for floor leveling after the Release until about three years later—in May 2017 (Simons dep. 38:13-16 (R4, tab 50 at 5585); Simons decl. ¶¶ 13, 15-16 (R4, tab 52 at 5823)).

13. GSC's President, Mr. Locke McKnight, submitted three declarations: (1) McKnight Declaration I dated October 25, 2018 (attached to app. resp. to gov't summary judgment motion); (2) McKnight Declaration II dated March 21, 2022 (app. supp. R4, tab 16); and (3) McKnight Declaration III dated April 21, 2022. In those declarations, President McKnight stated that the floor leveling issue was not resolved between the parties (McKnight Declaration I ¶ 10; McKnight Declaration II ¶ 1). The only basis that President McKnight offered for that assertion is that "the Board found that the totality of the floor leveling claim was not resolved by the" Release in *GSC I* (McKnight Declaration III ¶ 3).

14. On July 30, 2015, Vice President Phillips sent an email to Mastercraft asking "[i]f we can get the bag count for the ardex or other material you used for the floor leveling" on the Project (supp. R4, tab 42 at 5027-28). On August 12, 2015, Mastercraft responded that Mastercraft used 533 bags at a cost of $39,975 (*id*. at 5029).

5

III.    Flooding

15.  The Contract included Federal Acquisition Regulation (FAR) 52.246-21, WARRANTY OF CONSTRUCTION (MAR 1994) (Warranty of Construction Clause), which stated in part that:

> (c)    The Contractor shall remedy at the Contractor's expense any failure to conform, or any defect.  In addition, the Contractor shall remedy at the Contractor's expense any damage to Government-owned or controlled real or personal property, when the damage is the result of--
>
> (1)    The Contractor's failure to conform to contract requirements; or
>
> (2)    Any defect of equipment, material, workmanship, or design furnished.

(R4, tab 3 at 212-13)[4]

16.  The Task Order indicated that the work would include plumbing (R4, tab 6 at 1062).  In particular, the Statement of Work required GSC to "[p]rovide a complete new plumbing system for the building," including water heaters (R4, tab 4 at 273).

17.  On May 8, 2015, GSC achieved substantial completion and/or the government took beneficial occupancy of Building 2834 (GPFOF ¶ 111; ARGPFOF ¶ 111).[5]

18.  On or about August 11, 2015, Fort Benning Department of Public Works maintenance contractor TIYA repaired the unit drain line of a condensate drain in the downstairs closet pursuant to Work Order No. 419535 (August 2015 Repairs).  There

---

[4] The Warranty of Construction Clause stated in subparagraph (b) that "[t]his warranty shall continue for a period of 1 year from the date of final acceptance of the work.  If the Government takes possession of any part of the work before final acceptance, this warranty shall continue for a period of 1 year from the date the Government takes possession."  (R4, tab 3 at 212)  The parties agree that the government either achieved substantial completion or took "beneficial occupancy" of Building 2834 on May 8, 2015 (GPFOF ¶ 111; ARPFOF ¶ 111).  Therefore, the Warranty still covered Building 2824 at the time of the March 5, 2016 Flood and the April 3, 2016 Flood.

[5] "GPFOF" refers to the government's proposed findings of fact in its opening brief.  "ARGPFOF" refers to the appellant's response to the GPFOF in its reply brief.

is no indication in Work Order No. 419535 that TIYA worked on the boiler or the water heaters. (R4, tab 39)

19. On March 5, 2016, TIYA received a call regarding flooding in the basement (March 5, 2016 Flood) (R4, tab 29 at 4715). TIYA issued three work orders in connection with the March 5, 2016 Flood. On March 5, 2016, TIYA issued Work Order Nos. 461521 and 461528 (*id*. at 4715-16). According to those work orders, TIYA found water in the basement, and determined that "[a] 2" water line on boiler 5 blew apart at a male adapt because the fitting was cross threaded into the valve it was connected to" (*id*.).[6] TIYA pumped out the water and had the leak fixed. (*id*.). On March 9, 2016, TIYA issued Work Order No. 462195 to address the March 5, 2016 Flood (R4, tab 40 at 5007). Work Order No. 462195 indicated that TIYA cleaned and sanitized the basement, checked and dried the switch gear and other electrical equipment affected by water damage, and "repaired domestic hot water heaters with replacement parts" (*id*.).

20. On March 10, 2016, government notified GSC about the March 5, 2016 Flood stating that:

> One of the 2" hot water lines in the MECH room of Bldg 2834 pulled apart at the boiler and flooded the basement. It appears the cause of failure is due to the pipe being cross threated….only about 2 threads were caught. The entire basement area flooded, to include the office area. Several damaged equipment in the MECH room as well as finishes in the office space, including swelling of the office doors. This is a Priority One (meaning response is required within 24 hours) warranty repair event and needs immediate action. Please respond with the corrective action plan.

(R4, tab 42 at 5030). The government also provided GSC a photograph showing the threading (*id.* at 5041).

---

[6] Cross threading occurs when a threaded connection engages at an angle rather than straight on. The three primary reasons cross threading occurs are: (1) the external and internal threads are incompatible; (2) a user makes an improper connection; or (3) foreign material, such as dirt or rust, sits between the individual threads. Cross threading may result in permanent damage to the threads, and leaks. *See* https://tameson.com/pages/cross-threading.

21.  On March 10, 2016, GSC inspected the site (app. supp. R4, tab 4 at 1).[7]  On March 16, 2016, GSC had its subcontractor, United Maintenance, Inc. (United Maintenance), check all of the boilers and the water heaters.  United Maintenance spent 10 hours testing the safety devices and components of each boiler and water heater.  (App. supp. R4, tab 7 at 17-18)  On its invoice to GSC, United Maintenance indicated for each of the four water heaters, "LAARS NEOTHERM M# NTV850NXX3" (app. supp. R4, tab 7 at 17-18).  United Maintenance later reported in an April 26, 2016 email to GSC that:

> On March 16, 2016, I was requested to visit Bldg # 2834 Mechanical room for [warranty] service of the water heaters and boiler.  During that review, three of the four water heaters and the boiler were not operable, and the controllers had been swapped around between them. Water heater #4 had the controller for boiler #1 on it and was operable.  Boiler #1 also had the incorrect controller and was inoperable.
>
> Boiler #1 is for the hydronic hot water system, and not the domestic hot water. . . .  The difference between the water heater and the boiler ride mostly within software.  The largest differen[ce] [between the boiler and the water heater] is the high limit control.  This is the maximum allowed temperature of the outlet water from the heat exchanger.  On a water heater this program parameter [sic] is limited to 200F and on the boiler it is limited to 230F.
>
> The piping system for the domestic hot water is built with [chlorinated polyvinyl chloride] which has a temperature limit of 200F. . . . This is a good strong material when used within the design specifications.
>
> At no time did I try to service this water heater since this would be unadvisable.  It was clear to me that the placement of the boiler controller on the water heater was ill-advised and can harm the hot water piping system due to high temperatures and pressures.  The boiler would have had a higher high temperature limit than the domestic water piping system is designed to withstand.  This configuration would certainly lead to problems during high

_____

[7] GSC did not consistently number the pages of its supplemental Rule 4 file; accordingly, our citations are to pdf page numbers.

8

> demands; (for example when the 150 troops shower) and
> failure of the piping system.
>
> With that being known it is the recommendation to replace
> all water heaters and associated piping as the stresses on
> the system are incalculable in this arrangement.

(App. supp. R4, tab 4 at 3)

22. The government notified GSC of another leak on or about March 31, 2016 (R4, tab 32 at 4722). GSC had its plumber, Roto-Rooter, repair the leak on April 1, 2016, and April 2, 2016 (April 2016 Repairs) (*id.*; Culpepper Decl. ¶ 17 (supp. R4, tab 53 at 5829)).

23. The day after Roto-Rooter completed the April 2016 Repairs, another leak flooded the basement of Building 2834 on April 3, 2016[8] (April 3, 2016 Flood, collectively with the March 5, 2016 Flood, Floods) (Simons decl. ¶ 21 (R4, tab 52 at 5823); R4, tab 31 at 4,719). The April 3, 2016 Flood occurred at the same location as the April 2016 Repairs (Simons decl. ¶ 21 (supp. R4, tab 52 at 5823)). According to Mr. Eddie Culpepper, an area engineer with the government, the April 3, 2016 Flood resulted in 68 inches of water in the mechanical room and 18 inches of water in the basement office area and hallway (Culpepper decl. ¶ 18 (R4, tab 53 at 5829)).

24. In two letters to GSC dated April 5, 2016 and April 8, 2016, the government identified the cause of the April 3, 2016 Flood as a failure of Roto-Rooter's April 2016 Repairs, and requested that GSC remedy the defect and the damage (R4, tabs 30-31). GSC confirmed in an April 11, 2016 letter that it had received notice on April 3, 2016, that Roto-Rooter's April 2016 Repairs failed (R4, tab 32 at 4,722). GSC began remediation around April 4, 2016 (*id.*; R4, tab 42 at 5080).

25. In his first two declarations, GSC President McKnight blamed the Floods on work done by TIYA on August 11, 2015, and pursuant to Work Order No. 462195 on March 9, 2016. President McKnight declared that:

> The Base Support contractor [TIYA]'s work orders
> demonstrate that it was working in the area of the
> basement HVAC system on 8-11-15. Subsequently there

---

[8] There is some evidence that the flooding actually began in the evening of April 2, 2016 (R4, tab 31 at 4719). However, whether the flooding began on April 2, 2016, or April 3, 2016 does not impact our analysis, so we refer to it as the April 3, 2016 Flood for ease of reference.

was a leak in the same systems. GSC did not make any repairs or work related to the March 5, 2016, flood. Subsequently, following the April 2016 flood, GSC was able to determine that the base support contractor or some entity other than GSC had modified HVAC equipment through work order #462195.

(McKnight Declaration I ¶ 15; McKnight Declaration II ¶ 7) In particular, President McKnight asserted that, as part of the work on March 9, 2016, pursuant to Work Order No. 462195, TIYA's "repair was to take out the panel on the boiler and put it on the water heater" (McKnight Declaration III ¶ 12). According to President McKnight, this had two effects. First, he oddly claims that it caused a spike in water pressure, which caused the thread to break and the March 5, 2016 Flood. As President McKnight declared, the "Government has failed to acknowledge the boiler panel being placed by the base support contractor on the hot water heater and three of four hot water heaters not working at the flood. So of course, after a year of operation the cross thread gives way no [sic] it was a spike in pressure due to the fact [sic] government actions." (McKnight Declaration III ¶ 16) Second, President McKnight asserted that TIYA's replacement of a water heater control panel with a boiler control panel caused the water to superheat, which damaged the joints that Roto-Rooter had just cemented and caused the April 3, 2016 Flood (McKnight Declaration III ¶¶ 12-14. As President McKnight declared, "[w]hen Rotorooter put the hot water heater back on [as part of the April 2016 Repairs] . . . their technician did not know that the base support contractor had modified the control panel. This caused the water to super heat" (*id.* at ¶ 13). The superheated water, in turn, caused the newly cemented joints to fail, and thus the April 3, 2016 Flood (*id.* at ¶ 14).

26. President McKnight provided a photograph, which he declared showed the incorrect control panels on a water heater (McKnight Declaration I ¶ 17; McKnight Declaration II ¶ 9). The government does not dispute President McKnight's assertion regarding the content of the photograph in its Rule 11 submissions to the Board (gov't br. at 38). Thus, we conclude that the photograph showed the incorrect control panel on a water heater. The photograph was dated April 20, 2016 (McKnight Declaration I, attach.).

27. In the November 1, 2016 email, GSC's attorney stated to an attorney for BITCO—GSC's insurance company—that the April 3, 2016 Flood "was the responsibility of Roto Rooter" (app. supp. R4, tab 6 at 1). Similarly, in a December 20, 2017, settlement agreement with BITCO, GSC agreed to file a lawsuit against Roto-Rooter, and "warrant[ed] that it is entitled to the payment [of the settlement amount] from Roto-Rooter" (R4, tab 44 at 5252, 5254-55). There is no evidence in the record that GSC sued Roto-Rooter.

10

IV.     Procedural History

28.  On May 14, 2017, GSC filed claims with the CO, including claims regarding floor leveling and remedying the Floods (R4, tab 12 at 1103-04).  GSC revised its claims on July 26, 2017, to add a certification (R4, tab 14).

29.  On February 15, 2018, the CO issued a final decision, finding partial merit to the claims, but denying the rest of the claims, including the floor leveling and remedying the Floods claims (R4, tab 2 at 3, 11-14, 18-24, 26-27).

30.  This appeal followed.

31.  The government moved for summary judgment.  On June 4, 2020, we issued a decision in *GSC I*, granting that motion in part, and denying it in part.  20-1 BCA ¶ 37,626.  Regarding the floor leveling claim, we held that:

> The leveling of the slabs that is addressed in [the Release] is specifically stated to be attributable to the application of fiberwrap, something that is possibly independent and apart from the levelness issue that was initially raised by appellant in July 2013. . . .  [W]e find the record on the issue of slab levelness is sufficiently clouded that the better course in the circumstances is to exercise our discretion to hold a hearing on this issue.

*Id*. at 182,667-68.  We also concluded that there was a genuine issue of material fact regarding who was responsible for the Floods.  *Id.* at 182,669.

DECISION

As discussed below, this appeal is denied as to the floor leveling claim and the March 5, 2016 Flood claim, but is sustained as to the April 3, 2016 Flood claim.

I.     The Floor Leveling Claim

This appeal is denied as to the floor leveling claim because the government has shown that GSC's floor leveling claim is barred by the release defense.[9]  The release

_____

[9] The United States Court of Appeals for the Federal Circuit has held that release and accord and satisfaction are separate defenses.  *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010).  Because we find that the release defense applies, we decline to reach the issue of whether the accord and satisfaction defense also applies.

11

defense applies when there "is a contract whereby a party abandons a claim or relinquishes a right that could be asserted against another." *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010) (citations omitted). "A release is contractual in nature and must be interpreted in the same manner as any other contract term or provision." *Korte-Fusco Joint Venture*, ASBCA No. 59767, 15-1 BCA ¶ 36,158 at 176,455 (citing *Bell BCI Co. v. United States*, 570 F.3d 1337, 1341 (Fed. Cir. 2009)). In interpreting a contract, "clear and unambiguous [contract provisions] . . . must be given their plain and ordinary meaning . . . and we may not resort to extrinsic evidence to interpret them." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (citations omitted) (en banc). A contract is ambiguous if it is susceptible to more than one reasonable interpretation. *E.L. Hamm & Assoc., Inc. v. England*, 379 F.3d 1334, 1341 (Fed. Cir. 2004). If the terms of a contract are ambiguous, we may consider extrinsic evidence. *Korte-Fusco*, 15-1 BCA ¶ 36,158 at 176,455 (citing *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988)). It is the government's burden to prove defenses, such as release, *see Stockton East Water Dist. v. United States*, 583 F.3d 1344, 1360 (Fed. Cir. 2009), by a preponderance of the evidence. *Techni Data Laboratories*, ASBCA No. 21054, 77- 2 BCA ¶ 12,667 at 61,410.

Here, the government has shown that the Release released the floor leveling claim. First, the clear and unambiguous language of the Release released all claims in GSC's May 29, 2013 request for equitable adjustment that resulted in the negotiated $412,337.34 adjustment by stating that:

> This modification . . . is issued based on the Government's receipt of GSC's Request for Equitable Adjustment (REA) negotiated for the amount of $412,337.34. On May [2]9, 2013, the Contractor submitted a REA for compensation for add'l progressive collapse measures. The Contracting Officer determined the REA has merit, in part, and the parties have reached a fair & reasonable adjustment in contract price for settlement in full of the REA including all direct & indirect costs associated with this change. . . . It is understood & agreed the contract price is increased in the lump sum amount as stated for full & complete settlement of the REA. . . . Payment of the amount indicated constitutes an accord & satisfaction of all outstanding claims by the Contractor.

(Finding ¶ 11)

Second, the undisputed evidence shows that GSC's May 29, 2013 request for equitable adjustment that resulted in the negotiated $412,337.34 adjustment included

the floor leveling claim. GSC's Progressive Collapse Resistance Proposal for $499,931.60—which it submitted in reply to the request for proposal that the government sent in response to GSC's May 29, 2013 request for equitable adjustment—undisputedly included $81,530.50 for floor leveling. (Findings ¶¶ 8-9) Further, the May 13, 2014 Price Negotiation Memorandum undisputedly showed that the negotiations regarding that proposal that resulted in the $412,337.34 adjustment and the Release included the floor leveling claim (finding ¶ 10). In particular, the Price Negotiation Memorandum showed that the government determined that the floor leveling claim did not have merit, and the parties agreed that GSC was not entitled to $81,530.50 for floor leveling (*id.*).[10] Because GSC's May 29, 2013 request for equitable adjustment that resulted in the negotiated $412,337.34 adjustment included the floor leveling claim and the Release unambiguously released all claims in GSC's May 29, 2013 request for equitable adjustment that resulted in the negotiated $412,337.34 adjustment, the Release released the floor leveling claims.

Relying upon the McKnight declarations, GSC argues that we held in *GSC I* that the totality of the floor leveling claim was not addressed in the Release (app. br. at 14; finding ¶ 13). That misstates our holding in *GSC I*. In *GSC I* we merely denied the government's summary judgment motion on the grounds that the "leveling of the slabs that is addressed in [the Release] is specifically stated to be attributable to the application of fiber wrap, something that is *possibly* independent and apart from the levelness issue that was initially raised by [GSC] in July 2013[.]" 20-1 BCA ¶37,626, at 182,667-68 (emphasis added).

---

[10] While the Price Negotiation Memorandum was an internal government document, GSC does not object to its reliability (GPFOF ¶¶ 61-64; ARGPFOF ¶¶ 61-64). In particular, GSC does not object to the Price Negotiation Memorandum as hearsay, so the parties did not brief—and we do not address—whether the Price Negotiation Memorandum is hearsay, whether it falls into a hearsay exception, or whether we should follow the hearsay rule in this Rule 11 appeal (*id.*; *see also* Federal Rules of Evidence 802, 803, 807; Board Rule 10(c) (stating that the Federal Rules of Evidence are not binding on the Board but may guide our rulings)). In any event, we note that the Price Negotiation Memorandum presents several indicia of reliability—namely that: (1) it is a contemporaneous document prepared prior to any motive to fabricate for purposes of litigation or likely memory loss; and (2) the Release corroborates the Price Negotiation Memorandum's indication that the government determined that the floor leveling claim did not have merit and that the parties agreed to reduce the adjustment to $412,337.34, the government determined that the request for equitable adjustment "has merit, *in part*, and the parties have reached a fair & reasonable adjustment in contract price" of $412,337.34 (finding ¶ 11 (emphasis added)).

Now that we are deciding the merits, we conclude that the preponderance of the evidence shows that there is no floor leveling claim independent and apart from the floor leveling claim addressed in the Release. Project Engineer Simons declared that the Release addressed the floor leveling claim (finding ¶ 12). The contemporaneous evidence supports that assertion. First, the Price Negotiation Memorandum demonstrates that the entire floor leveling claim was related, connected, and attributable to the application of fiber wrap that the Release addressed by showing that the widespread unevenness in floor elevation caused by the application of fiber wrap required the floor leveling throughout Building 2833 and 2834 anyway (finding ¶ 10)—regardless of any pre-existing unevenness (finding ¶ 7). Second, nowhere in the Release—or anywhere else in the record—did GSC reserve its right to pursue a floor leveling claim independent and apart from the floor leveling claim addressed in the Release (finding ¶ 11). Finally, the fact that the amount of floor leveling compound used on the Project (533 bags at a cost of $39,975) was significantly less than the amount of floor leveling compound that was part of the floor leveling claim addressed in the Release (1,304 bags at a cost of $81,530.50) supports the conclusion that there were no floor leveling costs independent and apart from the costs addressed in the Release (findings ¶¶ 9, 14) since we can reasonably infer, based on GSC's initial estimates, that there was a need to use a substantial amount of levelling compound as part of the progressive collapse mitigation. Thus, the preponderance of the evidence indicates that there is no floor leveling claim independent and apart from the floor leveling claim addressed in the Release.

GSC also appears to argue that the floor leveling claim covered by the Release is independent and apart from the floor leveling claim that GSC raised in July 2013 because the floor leveling claim that GSC raised in July 2013 purportedly covered floor leveling in Building 2834, not Building 2833 (app. br. at 14). However, the floor leveling claim that GSC raised in July 2013 did not cover Building 2834 (finding ¶ 7). Moreover, the floor leveling claim addressed in the Release covered leveling in both Buildings 2833 and 2834, as demonstrated by the Mastercraft quote attached to GSC's Progressive Collapse Resistance Proposal (finding ¶ 9). Therefore, any attempt to argue that the floor leveling claim raised in July 2013 covered Building 2834, while the floor leveling claim addressed in the Release covered Building 2833, fails.

In sum, the government has shown by a preponderance of the evidence that the Release covered the floor leveling claim that GSC asserts here.

II.     Remedying the Floods Claims

The appeal is denied as to the March 5, 2016 Flood claim—but sustained as to the April 3, 2016 Flood claim—because the government has shown that the most probable cause of the March 5, 2016 Flood—but not the April 3, 2016 Flood—was GSC's defective materials or workmanship. The Warranty of Construction Clause

required GSC to remedy, at its expense, any defect and the damage to government property when the defect and the damage was the result of "[a]ny defect of equipment, material, workmanship, or design furnished." (Finding ¶ 15) As we have recognized, "[w]hen the Government asserts its rights under the WARRANTY OF CONSTRUCTION clause, it must prove that: (1) the material or workmanship was defective; and (2) the most probable cause of the failure was the deficiency." *Grid Constr., Inc.*, ASBCA No. 48458, 01-2 BCA ¶ 31,493, at 155,503 (citing *Earth Tech Indus.,* ASBCA No. 46450, 99-1 BCA ¶ 30,341 at 150,045; *Hogan Constr., Inc.*, ASBCA No. 38801, 95-1 BCA ¶ 27,396 at 136,575, *aff'd on recon.*, 95-2 BCA ¶ 27,688). Under that standard:

> The Government is not required to prove the cause of the failures with absolute certainty. The standard of proof is not that stringent. To establish such causation, it is sufficient for the Government to show that that the defective material or improper workmanship ordered to be corrected was "the most probable cause . . . of the failures, when considered with reference to other possible causes." *Abney Construction Co.*, ASBCA No. 23686, 80-2 BCA ¶ 14,506 at 71,514.

*Grid Constr.*, 01-2 BCA ¶ 31,493, at 155,503 (quoting *Airport Constr. & Materials, Inc.*, ASBCA No. 32583, 87-1 BCA ¶ 19,361 at 97,927).

Here, the parties point to conflicting possible causes for the Floods. On the one hand, the government argues that defective cross threading was the most probable cause of the March 5, 2016 Flood (gov't br. at 34). The government also argues that defective repairs by GSC's subcontractor Roto-Rooter were the most probable cause of the April 3, 2016 Flood (*id.*). On the other hand, GSC argues that, on either on August 11, 2015 or March 9, 2016, Base Support contractor TIYA replaced a water heater control panel with a boiler control panel, which superheated the water from the water heater (app. br. at 15-17; finding ¶ 25). GSC argues that that superheated water, in turn, caused the March 5, 2016 Flood by causing the threads to break (app. br. at 17). GSC also argues that the superheated water caused the April 3, 2016 Flood by causing Roto-Rooter's repair to fail (*id.*). As discussed in greater detail below, the government has satisfied its burden of showing that the most probable cause of the March 5, 2016 Flood was defective cross threading, but it has failed to satisfy its burden of showing that the most probable cause of the April 3, 2016 Flood was defective repairs by Roto-Rooter, when considered with reference to the other possible causes posited by GSC.

A.      The March 5, 2016 Flood

Under the Task Order, GSC was responsible for providing a completely new plumbing system (finding ¶ 16).  The contemporaneous evidence—namely TIYA Work Orders Nos. 461521 and 461528, the government's March 10, 2016 notification to GSC, and the photograph provided in connection with the March 10, 2016 notification—establish that the probable cause of the March 5, 2016 Flood was defective cross threading (findings ¶¶ 19-20).

That conclusion is only strengthened by the consideration of that probable cause with reference to other possible causes because there is no evidence that TIYA's replacement of a water heater control panel with a boiler control panel caused the March 5, 2016 Flood.  President McKnight suggests that TIYA might have replaced a water heater control panel with a boiler control panel during the August 2015 Repairs (finding ¶ 25).  However, there is no indication in the August 2015 Work Order that TIYA worked on the water heaters or boilers (finding ¶ 18).  Nor could TIYA's March 9, 2016 work have caused the March 5, 2016 Flood because that work occurred after that flood (finding ¶ 19).  Further, the TIYA Work Orders in response to the March 5, 2016 Flood indicated that the thread failure occurred on a water line on the boiler; not in the domestic hot water system connected to the water heater (*id.*).  Therefore, there is minimal—if any—possibility that the thread failure that caused the March 5, 2016 Flood was due to superheated water in the domestic hot water system resulting from TIYA's replacement of a water heater control panel with a boiler control panel.

In sum, the government has shown that the most probable causes of the March 5, 2016 Flood was defective cross threading.  As a result, the government has shown that it was entitled to require GSC to remedy the defect and the damage related to the March 5, 2016 Flood under the Warranty of Construction Clause.

B.      The April 3, 2016 Flood

The government has failed to show that the most probable cause of the April 3, 2016 Flood was Roto-Rooter's defective materials or workmanship.  Certainly, the April 5, 2016, April 8, 2016, and April 11, 2016 letters, and the fact that the leak causing the April 3, 2016, Flood occurred in the same location as, and shortly after, Roto-Rooter's April 2016, Repairs, demonstrate that the failure of Roto-Rooter's April 2016 Repairs caused the April 3, 2016 Flood (findings ¶¶ 23-24).  Yet, that just begs the question—what caused the failure of Roto-Rooter's April 2016 Repairs: Roto-Rooter's defective materials and workmanship, or the newly cemented joints leaking due to superheated water resulting from TIYA's replacing a water heater control panel with a boiler control panel?  There is some evidence to support the conclusion that Roto-Rooter's defective materials or workmanship caused the April 3,

2016 Flood—namely statements GSC made to its insurance company that the April 3, 2016 Flood was Roto-Rooter's responsibility (finding ¶ 27).[11]

However, the evidence supporting the conclusion that TIYA's replacement of a water heater control panel with a boiler control panel caused the April 3, 2016 Flood is at least as strong as—if not stronger than—the evidence supporting the contrary conclusion. President McKnight declared that, after the April 3, 2016 Flood, GSC was able to determine that TIYA had replaced a water heater control panel with a boiler control panel, which caused the April 3, 2016 Flood by superheating the water and damaging the joints that TIYA had just cemented (finding ¶ 25). The contemporaneous evidence supports that assertion. In particular, in Work Order No. 462195, TIYA indicated that it "repaired domestic hot water heaters with replacement parts" on March 9, 2016 (finding ¶ 19). Moreover, a photograph showed the incorrect control panel on a water heater (finding ¶ 26). While the government is correct that the photograph was not taken until April 20, 2016 (gov't br. at 38; finding ¶ 26), other contemporaneous evidence confirms that the incorrect control panel was on the water heater on March 16, 2016—shortly after TIYA repaired the water heater with replacement parts on March 9, 2016, and before the April 3, 2016 Flood. Namely, United Maintenance reported that, when it serviced the water heaters and boilers on March 16, 2016, it observed that "the controllers had been swapped around between [the water heaters and boilers].[12] Water heater #4 had the controller for boiler

---

[11] The government also points to the fact that, on its invoice, United Maintenance included the same model number under each water heater to suggest that all of the water heaters had the same control panel (gov't reply br. at 6). However, the government provides no evidence that the "LAARS NEOTHERM M# NTV850NXX3" indication on the invoice referred to the model number of the water heater control panels—as opposed to the water heaters (*id.*). On the contrary, "LARS NEOTHERM NTV850NXX3" appears to refer to water heaters and not just their control panels. *See* https://www.manualslib.com/products/Laars-Neotherm-Ntv850nxx3-13524640.html.

[12] While we have some concerns that United Maintenance appears to have waited over a month to report that a water heater control panel had been replaced with a boiler control panel (finding ¶ 21), the government—which bears the burden of proof—has presented no evidence that that delay constituted defective workmanship. Moreover, the government has not shown that any defective workmanship on the part of United Maintenance was the most probable cause of the April 3, 2016 Flood, instead of TIYA's defective workmanship of replacing the water heater control panel with a boiler control panel in the first place. *Cf. Marine Hydraulics Int'l, LLC*, ASBCA No. 62817, 2024 WL 2013891 (ASBCA April 16, 2024) (holding that the government's failure to take measurements that would have revealed a contractor's defective

#1 on it . . . ." (Finding ¶ 21)  United Maintenance explained that this was "ill-advised and can harm the hot water piping system" because the boiler control panel heats water to a temperature above the high temperature limit of the domestic water piping system used by the water from the water heaters (*id.*).  Thus, United Maintenance concluded that "[t]his configuration would certainly lead to . . . failure of the piping system" (*id.*).

In sum, because the evidence that the cause of the April 3, 2016 Flood was TIYA improperly replacing a water heater control panel with a boiler control panel is at least as strong as the evidence that the cause of the April 3, 2016 Flood was Roto-Rooter's defective materials or workmanship, the government has not satisfied its burden of showing that the most probable causes of the April 3, 2016 Flood was Roto-Rooter's defective materials or workmanship when considered with reference to other possible causes.  As a result, the government has not shown that it was entitled to require GSC to remedy the defect and the damage related to the April 3, 2016 Flood under the Warranty of Construction Clause.

<u>CONCLUSION</u>

For the foregoing reasons, the appeal is denied as to the floor leveling claim and the March 5, 2016 Flood claim.  However, the appeal is sustained as to the April 3, 2016 Flood claim.  The appeal is returned to the parties for a determination of quantum.

Dated:  May 27, 2025

_____
JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

workmanship did not cause the damage that resulted from that defect); *ECC Int'l Constructors/Metag (JV)*, ASBCA No. 62124, 2023 WL 7107326 (ASBCA Sept. 20, 2023) (holding that the government's review or approval of defective construction transmittals did not relieve a contractor of its responsibility for the defect).

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61380, Appeal of GSC Construction, Inc., rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals